# BRINEGAR *v.* UNITED STATES.

No. 12. Argued October 18–19, 1948.—Decided June 27, 1949.

*Irving E. Ungerman* argued the cause for petitioner. With him on the brief was *Leslie L. Conner.*

*Stanley M. Silverberg* argued the cause for the United States. *Solicitor General Perlman, Assistant Attorney General Campbell, Robert S. Erdahl* and *Beatrice Rosenberg* were on the brief.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Brinegar was convicted of importing intoxicating liquor into Oklahoma from Missouri in violation of the federal statute which forbids such importation contrary to the laws of any state.[1] His conviction was based in

---

[1] Section 3 (a) of the Liquor Enforcement Act of 1936, 49 Stat. 1928, 27 U. S. C. § 223, provides: "Whoever shall import, bring, or transport any intoxicating liquor into any State in which all sales (except for scientific, sacramental, medicinal, or mechanical purposes) of intoxicating liquor containing more than 4 per centum of alcohol by volume are prohibited, otherwise than in the course of continuous interstate transportation through such State, or attempt so to do, or assist in so doing, shall: (1) If such liquor is not accompanied by such permit or permits, license or licenses therefor as are now or hereafter required by the laws of such State; or (2) if all importation, bringing, or transportation of intoxicating liquor into such State is prohibited by the laws thereof; be guilty of a misdemeanor and shall be fined not more than $1,000 or imprisoned not more than one year, or both." Okla. Sess. Laws, 1939, c. 16,

part on the use in evidence against him of liquor seized from his automobile in the course of the alleged unlawful importation.

Prior to the trial Brinegar moved to suppress this evidence as having been secured through an unlawful search and seizure.[2] The motion was denied, as was a renewal of the objection at the trial.

The Court of Appeals affirmed the conviction, 165 F. 2d 512, and certiorari was sought solely on the ground that the search and seizure contravened the Fourth Amendment and therefore the use of the liquor in evidence vitiated the conviction. We granted the writ to determine this question. 333 U. S. 841.

The facts are substantially undisputed. At about six o'clock on the evening of March 3, 1947, Malsed, an investigator of the Alcohol Tax Unit, and Creehan, a special investigator, were parked in a car beside a highway near the Quapaw Bridge in northeastern Oklahoma. The point was about five miles west of the Missouri-Oklahoma line. Brinegar drove past headed west in his Ford coupe. Malsed had arrested him about five months earlier for illegally transporting liquor; had seen him loading liquor into a car or truck in Joplin, Missouri, on at least two occasions during the preceding six months; and knew him to have a reputation for hauling liquor. As Brinegar passed, Malsed recognized both him and the Ford. He told Creehan, who was driving the officers' car, that

Art. 1, § 1, in effect at the time of petitioner's arrest, made it unlawful to import or cause to be imported into that state, without a permit, any intoxicating liquor containing more than 4 per cent of alcohol by volume.

[2] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U. S. Const. Amend. IV.

Brinegar was the driver of the passing car. Both agents later testified that the car, but not especially its rear end, appeared to be "heavily loaded" and "weighted with something." Brinegar increased his speed as he passed the officers. They gave chase. After pursuing him for about a mile at top speed, they gained on him as his car skidded on a curve, sounded their siren, overtook him, and crowded his car to the side of the road by pulling across in front of it. The highway was one leading from Joplin, Missouri, toward Vinita, Oklahoma, Brinegar's home.

As the agents got out of their car and walked back toward petitioner, Malsed said, "Hello, Brinegar, how much liquor have you got in the car?" or "How much liquor have you got in the car this time?" Petitioner replied, "Not too much," or "Not so much." After further questioning he admitted that he had twelve cases in the car. Malsed testified that one case, which was on the front seat, was visible from outside the car, but petitioner testified that it was covered by a lap robe. Twelve more cases were found under and behind the front seat. The agents then placed Brinegar under arrest and seized the liquor.

The district judge, after a hearing on the motion to suppress at which the facts stated above appeared in evidence, was of the opinion that "the mere fact that the agents knew that this defendant was engaged in hauling whiskey, even coupled with the statement that the car appeared to be weighted, would not be probable cause for the search of this car." Therefore, he thought, there was no probable cause when the agents began the chase. He held, however, that the voluntary admission made by petitioner after his car had been stopped constituted probable cause for a search, regardless of the legality of the arrest and detention, and that therefore the evidence was admissible. At the trial, as has been said, the court overruled petitioner's renewal of the objection.

The Court of Appeals, one judge dissenting, took essentially the view held by the District Court. The dissenting judge thought that the search was unlawful and therefore statements made during its course could not justify the search.

The crucial question is whether there was probable cause for Brinegar's arrest, in the light of prior adjudications on this problem, more particularly *Carroll* v. *United States,* 267 U. S. 132, which on its face most closely approximates the situation presented here.[3]

The *Carroll* decision held that, under the Fourth Amendment, a valid search of a vehicle moving on a public highway may be had without a warrant, but only if probable cause for the search exists.[4] The Court then went on to rule that the facts presented amounted to probable cause for the search of the automobile there involved. 267 U. S. 132, 160.

In the *Carroll* case three federal prohibition agents and a state officer stopped and searched the defendants' car on a highway leading from Detroit to Grand Rapids, Michigan, and seized a quantity of liquor discovered in the search. About three months before the search, the two defendants and another man called on two of the agents at an apartment in Grand Rapids and, unaware that they were dealing with federal agents, agreed to sell one of the agents three cases of liquor. Both agents noticed the Oldsmobile roadster in which the three men came to the

---

[3] Neither the opinion of the Court of Appeals nor the unpublished opinion of the trial court refers to the *Carroll* case.

[4] "The Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable. . . . On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid." *Carroll* v. *United States,* 267 U. S. 132, 147, 149.

apartment and its license number. Presumably because the official capacity of the proposed purchaser was suspected by the defendants, the liquor was never delivered.

About a week later the same two agents, while patrolling the road between Grand Rapids and Detroit on the lookout for violations of the National Prohibition Act, were passed by the defendants, who were proceeding in a direction from Grand Rapids toward Detroit in the same Oldsmobile roadster. The agents followed the defendants for some distance but lost trace of them. Still later, on the occasion of the search, while the officers were patrolling the same highway, they met and passed the defendants, who were in the same roadster, going in a direction from Detroit toward Grand Rapids. Recognizing the defendants, the agents turned around, pursued them, stopped them about sixteen miles outside Grand Rapids, searched their car and seized the liquor it carried.

This Court ruled that the information held by the agents, together with the judicially noticed fact that Detroit was "one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior" (267 U. S. at 160), constituted probable cause for the search.

## I.

Obviously the basic facts held to constitute probable cause in the *Carroll* case were very similar to the basic facts here. In each case the search was of an automobile moving on a public highway and was made without a warrant by federal officers charged with enforcing federal statutes outlawing the transportation of intoxicating liquors (except under conditions not complied with).[5]

---

[5] The substantive offense charged in *Carroll* was violation of the National Prohibition Act, 41 Stat. 305; here, violation of the Liquor Enforcement Act of 1936.

In each instance the officers were patrolling the highway in the discharge of their duty. And in each before stopping the car or starting to pursue it they recognized both the driver and the car, from recent personal contact and observation, as having been lately engaged in illicit liquor dealings.[6] Finally, each driver was proceeding in his identified car in a direction from a known source of liquor supply toward a probable illegal market, under circumstances indicating no other probable purpose than to carry on his illegal adventure.[7]

These are the ultimate facts. Necessarily the concrete, subordinate facts on which they were grounded in the two cases differed somewhat in detail. The more important of the variations in details of the proof are as follows:

In *Carroll* the agent's knowledge of the primary and ultimate fact that the accused were engaged in liquor running was derived from the defendants' offer to sell liquor to the agents some three months prior to the search, while here that knowledge was derived largely from Malsed's personal observation, reinforced by hearsay; the officers when they bargained for the liquor in *Carroll* saw the number of the defendants' car, whereas no such fact is shown in this record; and in *Carroll* the Court took judicial notice that Detroit was on the international boundary and an active center for illegal impor-

---

[6] In this case identification of the car as having been previously used by Brinegar in his liquor-running activities was inferential, although identification of its use by him in Joplin, Mo., his source of supply, was direct and undisputed.

[7] The Government also stresses the fact, not present in the *Carroll* case, of flight by Brinegar after he realized he was being pursued. We find it is unnecessary to take account of this factor in deciding this case. As to the factor of flight, see *Husty* v. *United States*, 282 U. S. 694, 700–701; *Talley* v. *United States*, 159 F. 2d 703; *United States* v. *Heitner*, 149 F. 2d 105, 107; *Jones* v. *United States*, 131 F. 2d 539, 541; *Levine* v. *United States*, 138 F. 2d 627, 629.

tation of spirituous liquors for distribution into the interior, while in this case the facts that Joplin, Missouri, was a ready source of supply for liquor and Oklahoma a place of likely illegal market were known to the agent Malsed from his personal observation and experience as well as from facts of common knowledge.

Treating first the two latter and less important matters, in view of the positive and undisputed evidence concerning Malsed's identification of Brinegar's Ford, we think no significance whatever attaches, for purposes of distinguishing the cases, to the fact that in the *Carroll* case the officers saw and recalled the license number of the offending car while this record discloses no like recollection.

Likewise it is impossible to distinguish the *Carroll* case with reference to the proof relating to the source of supply, the place of probable destination and illegal market, and consequently the probability that the known liquor operators were using the connecting highway for the purposes of their unlawful business.

There were of course some legal as well as some factual differences in the two situations. Under the statute in review in *Carroll* the whole nation was legally dry. Not only the manufacture, but the importation, transportation and sale of intoxicating liquors were prohibited throughout the country. Under the statute now in question only the importation of such liquors contrary to the law of the state into which they are brought and in which they were seized is forbidden.

In the *Carroll* case the Court judicially noticed that Detroit was located on the international boundary with Canada and had become an active center for illegally bringing liquor into the country for distribution into the interior. This was pertinent in connection with other circumstances, for showing the probability under which the agents acted that use of the highway connecting

Detroit and Grand Rapids by the known operators in liquor was for the purpose of carrying on their unlawful traffic.

In this case, the record shows that Brinegar had used Joplin, Missouri, to Malsed's personal knowledge derived from direct observation, not merely from hearsay as seems to be suggested, as a source of supply on other occasions within the preceding six months. It also discloses that Brinegar's home was in Vinita, Oklahoma, and that Brinegar when apprehended was traveling in a direction leading from Joplin to Vinita, at a point about four or five miles west of the Missouri-Oklahoma line.

Joplin, like Detroit in the *Carroll* case, was a ready source of supply. But unlike Detroit it was not an illegal source. So far as appears, Brinegar's purchases there were entirely legal. And so, we may assume for present purposes, was his transportation of the liquor in Missouri, until he reached and crossed the state line into Oklahoma.

This difference, however, is insubstantial. For the important thing here is not whether Joplin was an illegal source of supply; it is rather that Joplin was a ready, convenient and probable one for persons disposed to violate the Oklahoma and federal statutes. That fact was demonstrated fully, not only by the geographic facts, but by Malsed's direct and undisputed testimony of his personal observation of Brinegar's use of liquor-dispensing establishments in Joplin for procuring his whiskey. Such direct evidence was lacking in *Carroll* as to Detroit, and for that reason the Court resorted to judicial notice of the commonly known facts to supply that deficiency. Malsed's direct testimony, based on his personal observation, dispensed with that necessity in this case.

The situation relating to the probable place of market, as bearing on the probability of unlawful importation, is somewhat different. Broadly on the facts this may well have been taken to be the State of Oklahoma as a

whole or its populous northeastern region. From the facts of record we know, as the agents knew, that Oklahoma was a "dry" state. At the time of the search, its law forbade the importation of intoxicating liquors from other states, except under a permit not generally procurable [8] and which there is no pretense Brinegar had secured or attempted to secure. This fact, taken in connection with the known "wet" status of Missouri and the location of Joplin close to the Oklahoma line, affords a very natural situation for persons inclined to violate the Oklahoma and federal statutes to ply their trade. The proof therefore concerning the source of supply, the place of probable destination and illegal market, and hence the probability that Brinegar was using the highway for the forbidden transportation, was certainly no less strong than the showing in these respects in the *Carroll* case.[9]

Finally, as for the most important potential distinction, namely, that concerning the primary and ultimate fact that the petitioner was engaging in liquor running, Malsed's personal observation of Brinegar's recent activities established that he was so engaged quite as effectively as did the agent's prior bargaining with the defendants in the *Carroll* case. He saw Brinegar loading liquor, in

---

[8] It was unlawful to import into Oklahoma, without a permit, any intoxicating liquor, as defined by the laws of that state, containing more than four per cent of alcohol by volume. See note 1 *supra*. Manufacture, sale, furnishing or transportation of intoxicating liquor was forbidden in Oklahoma. 37 Okla. Stat. § 1 (1941).

[9] Indeed the showing here was stronger because there was no necessity, as there was in the *Carroll* case, for resorting to judicial notice to establish either the probable source of supply or that it was illegal. On the present record judicial notice is hardly needed to give us cognizance of the differing laws of Missouri and Oklahoma, or of Joplin's proximity to the state line, and its ready convenience to one living as near by as Vinita who might be disposed to use it as a base of supply for importing liquor into Oklahoma in violation of the state and federal statutes.

larger quantities than would be normal for personal consumption, into a car or a truck in Joplin on other occasions during the six months prior to the search. He saw the car Brinegar was using in this case in use by him at least once in Joplin within that period and followed it. And several months prior to the search he had arrested Brinegar for unlawful transportation of liquor and this arrest had resulted in an indictment which was pending at the time of this trial. Moreover Malsed instantly recognized Brinegar's Ford coupe and Brinegar as the driver when he passed the parked police car. And at that time Brinegar was moving in a direction from Joplin toward Vinita only a short distance inside Oklahoma from the state line.

All these facts are undisputed. Wholly apart from Malsed's knowledge that Brinegar bore the general reputation of being engaged in liquor running, they constitute positive and convincing evidence that Brinegar was engaged in that activity, no less convincing than the evidence in *Carroll* that the defendants had offered to sell liquor to the officers. The evidence here is undisputed, is admissible on the issue of probable cause, and clearly establishes that the agent had good ground for believing that Brinegar was engaged regularly throughout the period in illicit liquor running and dealing.

Notwithstanding the variations in detail, therefore, we think the proof in this case furnishes support quite as strong as that made in the *Carroll* case, indeed stronger in some respects, to sustain the ultimate facts there held in the aggregate to constitute probable cause for a search identical in all substantial and material respects with the one made here. Nothing in the variations of detail affords a substantial basis for undermining here any of the ultimate facts held to be sufficient in *Carroll* or for distinguishing the cases. Each of the ultimate facts found in *Carroll* to constitute probable cause, when taken to-

gether, is present in this case and is fully substantiated by the proof. Accordingly the *Carroll* decision must be taken to control this situation, unless it is now to be overruled.

This is true, although the trial court and the Court of Appeals, including the dissenting judge, were of the opinion, as stated by the latter court, "that the facts within the knowledge of the investigators and of which they had reasonable trustworthy information prior to the time the incriminating statements were made by Brinegar were not sufficient to lead a reasonably discreet and prudent man to believe that intoxicating liquor was being transported in the coupe, and did not constitute probable cause for a search." 165 F. 2d at 514. If, as we think, the *Carroll* case is indistinguishable from this one on the material facts, and that decision is to continue in force, it necessarily follows that the quoted "finding" or "conclusion" was erroneous.[10] In the absence of any significant difference in the facts, it cannot be that the Fourth Amendment's incidence turns on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause.

## II.

It remains to consider one further asserted difference between this case and the *Carroll* case, having to do with the admissibility or inadmissibility at the trial of the evidence on which the agents acted in making the search, particularly the evidence concerning their knowledge that the defendants were engaging in illicit liquor running.

---

[10] As has been noted above, the *Carroll* case is neither cited nor referred to in any of the opinions filed in the trial court and the Court of Appeals. Nor is there anything in the record before us showing that the *Carroll* decision was considered in any of the rulings made in the hearing on the motion to suppress, at the trial, or in the Court of Appeals.

It is argued first that this case can be distinguished from *Carroll* because Malsed's knowledge of this primary and ultimate fact rested wholly or largely on surmise or hearsay. This argument is disproved by the facts of record which we have set forth above. There was hearsay, but there was much more. Indeed, as we have emphasized, the facts derived from Malsed's personal observations were sufficient in themselves, without the hearsay concerning general reputation, to sustain his conclusion concerning the illegal character of Brinegar's operations.

But a further distinction based upon inadmissibility of the evidence is asserted. It is said that, while in *Carroll* the defendants' offer to sell liquor to the agents was admissible and was admitted at the trial, here the evidence that Malsed had arrested Brinegar for illegal transportation of liquor several months before the search, though admitted on the hearing on the motion to suppress, was excluded at the trial. Cf. *Michelson* v. *United States,* 335 U. S. 469. The inference seems to be that the evidence concerning the prior arrest should not have been received at the hearing on the motion. In any event, the conclusion is drawn that the factors relating to inadmissibility of the evidence here, for purposes of proving guilt at the trial, deprive the evidence as a whole of sufficiency to show probable cause for the search and therefore distinguish this case from the *Carroll* case.

Apart from its failure to take account of the facts disclosed by Malsed's direct and personal observation, even if his testimony concerning the prior arrest were excluded, the so-called distinction places a wholly unwarranted emphasis upon the criterion of admissibility in evidence, to prove the accused's guilt, of the facts relied upon to show probable cause. That emphasis, we think, goes much too far in confusing and disregarding

the difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search. It approaches requiring (if it does not in practical effect require) proof sufficient to establish guilt in order to substantiate the existence of probable cause. There is a large difference between the two things to be proved, as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.

For a variety of reasons relating not only to probative value and trustworthiness, but also to possible prejudicial effect upon a trial jury and the absence of opportunity for cross-examination, the generally accepted rules of evidence throw many exclusionary protections about one who is charged with and standing trial for crime. Much evidence of real and substantial probative value goes out on considerations irrelevant to its probative weight but relevant to possible misunderstanding or misuse by the jury.

Thus, in this case, the trial court properly excluded from the record at the trial, cf. *Michelson* v. *United States*, 335 U. S. 469, Malsed's testimony that he had arrested Brinegar several months earlier for illegal transportation of liquor and that the resulting indictment was pending in another court at the time of the trial of this case. This certainly was not done on the basis that the testimony concerning arrest, or perhaps even the indictment, was surmise or hearsay or that it was without probative value. Yet the same court admitted the testimony at the hearing on the motion to suppress the evidence seized in the search, where the issue was not guilt but probable cause and was determined by the court without a jury.[11]

---

[11] The court however thought that, even with the fact of the arrest before it, the evidence was insufficient to show probable cause at the time Brinegar passed the police car.

The court's rulings, one admitting, the other excluding the identical testimony, were neither inconsistent nor improper. They illustrate the difference in standards and latitude allowed in passing upon the distinct issues of probable cause and guilt. Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property.

However, if those standards were to be made applicable in determining probable cause for an arrest or for search and seizure, more especially in cases such as this involving moving vehicles used in the commission of crime, few indeed would be the situations in which an officer, charged with protecting the public interest by enforcing the law, could take effective action toward that end.[12] Those standards have seldom been so applied.[13]

---

[12] The inappropriateness of applying the rules of evidence as a criterion to determine probable cause is apparent in the case of an application for a warrant before a magistrate, the context in which the issue of probable cause most frequently arises. The ordinary rules of evidence are generally not applied in *ex parte* proceedings, "partly because there is no opponent to invoke them, partly because the judge's determination is usually discretionary, partly because it is seldom final, but mainly because the system of Evidence rules was devised for the special control of trials by jury." 1 Wigmore, Evidence (3d ed., 1940) 19. See also Note, 46 Harv. L. Rev. 1307, 1310–1311.

[13] But see, e. g., *Grau* v. *United States,* 287 U. S. 124, 128, in which it was said by way of *dictum* that "A search warrant may issue only upon evidence which would be competent in the trial of the offense before a jury (*Giles* v. *United States,* 284 Fed. 208; *Wagner* v. *United States,* 8 F. (2d) 581 . . . ." For this proposition there was no authority in the decisions of this Court. It was stated in a case in

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

"The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." *McCarthy* v. *De Armit*, 99 Pa. St. 63, 69, quoted with approval in the *Carroll* opinion. 267 U. S. at 161. And this "means less than evidence which would justify condemnation" or conviction, as Marshall, C. J., said for the Court more than a century ago in *Locke* v. *United States*, 7 Cranch 339, 348. Since Marshall's time, at any rate,[14] it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the

which the evidence adduced to prove probable cause was not incompetent, but was insufficient to support the inference necessary to the existence of probable cause. The statement has not been repeated by this Court.

The *Wagner* case relies solely upon *Giles*, the other case cited in *Grau*, and holds a warrant bad which issued on the basis of "hearsay and conclusions." The *Grau* dictum occasionally has been applied or stated as dictum by the courts of appeals and district courts: *Simmons* v. *United States*, 18 F. 2d 85, 88; *Worthington* v. *United States*, 166 F. 2d 557, 564–565; see also *Reeve* v. *Howe*, 33 F. Supp. 619, 622; *United States* v. *Novero*, 58 F. Supp. 275, 279. Cf. *Davis* v. *United States*, 35 F. 2d 957. See Note, 46 Harv. L. Rev. 1307, 1310–1311, for a criticism of the *Grau* dictum. And see note 15, *infra*, and text.

[14] Marshall's full statement in *Locke* v. *United States* was: "It may be added, that the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation; and, in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion." 7 Cranch 339, 348.

belief that" an offense has been or is being committed. *Carroll* v. *United States,* 267 U. S. 132, 162.[15]

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

The troublesome line posed by the facts in the *Carroll* case and this case is one between mere suspicion and probable cause. That line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances. No problem of searching the home or any other place of privacy was presented either in *Carroll* or here. Both cases involve freedom to use public highways in swiftly moving vehicles for dealing in contraband, and to be un-

---

[15] To the same effect are: *Husty* v. *United States,* 282 U. S. 694, 700–701; *Dumbra* v. *United States,* 268 U. S. 435, 441; *Steele* v. *United States No. 1,* 267 U. S. 498, 504–505; *Stacey* v. *Emery,* 97 U. S. 642, 645.

The *Carroll* opinion also quotes with approval the following statement: "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient." P. 161. Ascription of the statement to *Locke* v. *United States,* 7 Cranch 339, appears to be an error in citation.

molested by investigation and search in those movements. In such a case the citizen who has given no good cause for believing he is engaged in that sort of activity is entitled to proceed on his way without interference.[16] But one who recently and repeatedly has given substantial ground for believing that he is engaging in the forbidden transportation in the area of his usual operations has no such immunity, if the officer who intercepts him in that region knows that fact at the time he makes the interception and the circumstances under which it is made are not such as to indicate the suspect is going about legitimate affairs.

This does not mean, as seems to be assumed, that every traveler along the public highways may be stopped and searched at the officers' whim, caprice or mere suspicion.[17] The question presented in the *Carroll* case lay on the border between suspicion and probable cause. But the Court carefully considered that problem and resolved it by concluding that the facts within the officers' knowledge when they intercepted the *Carroll* defendants amounted to more than mere suspicion and constituted probable cause for their action. We cannot say this conclusion was wrong, or was so lacking in reason and consistency with the Fourth Amendment's purposes that it

---

[16] See the discussion of exceptions in the *Carroll* opinion, 267 U. S. 132, 149 ff.

[17] "It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." *Carroll* v. *United States*, 267 U. S. 132, 153–154.

should now be overridden. Nor, as we have said, can we find in the present facts any substantial basis for distinguishing this case from the *Carroll* case.

Accordingly the judgment is

*Affirmed.*

MR. JUSTICE BURTON, concurring.

I join in the opinion of the Court that there was probable cause for the search within the standards established in *Carroll* v. *United States,* 267 U. S. 132.

Whether or not the necessary probable cause for a search of the petitioner's car existed *before* the government agents caught up with him and said to him, "How much liquor have you got in the car this time?" and he replied, "Not too much," it is clear, and each of the lower courts found, that, under all of the circumstances of this case, the necessary probable cause for the search of the petitioner's car *then* existed. If probable cause for the search existed at that point, the search which then was begun was lawful without a search warrant as is demonstrated in the opinion of the Court. That search disclosed that a crime was in the course of its commission in the presence of the arresting officers, precisely as those officers had good reason to believe was the fact. The ensuing arrest of the petitioner was lawful and the subsequent denial of his motion to suppress the evidence obtained by the search was properly sustained.

It is my view that it is not necessary, for the purposes of this case, to establish probable cause for the search at any point earlier than that of the above colloquy. The earlier events, recited in the opinion of the Court, disclose at least ample grounds to justify the chase and official interrogation of the petitioner by the government agents in the manner adopted. This interrogation quickly disclosed indisputable probable cause for the search and for the arrest. In my view, these earlier events not only justified the steps taken by the govern-

ment agents but those events imposed upon the government agents a positive duty to investigate further, in some such manner as they adopted. It is only by alertness to proper occasions for prompt inquiries and investigations that effective prevention of crime and enforcement of law is possible. Government agents are commissioned to represent the interests of the public in the enforcement of the law and this requires affirmative action not only when there is reasonable ground for an arrest or probable cause for a search but when there is reasonable ground for an investigation. This is increasingly true when the facts point directly to a crime in the course of commission in the presence of the agent. Prompt investigation may then not only discover but, what is still more important, may interrupt the crime and prevent some or all of its damaging consequences.

In the present case, from the moment that the agents saw this petitioner driving his heavily laden car in Oklahoma, evidently en route from Missouri, the events justifying and calling for an interrogation of him rapidly gained cumulative force. Nothing occurred that even tended to lessen the reasonableness of the original basis for the suspicion of the agents that a crime within their particular line of duty was being committed in their presence. Nothing occurred to make it unlawful for them, in line of duty, to make the interrogation which suggested itself to them. When their interrogation of the petitioner led to his voluntary response as quoted above, that response demonstrated ample probable cause for an immediate search of the petitioner's car for the contraband liquor which he had indicated might be found there. The interrogation of the petitioner, thus made by the agents in their justifiable investigation of a crime reasonably suspected by them to be in the course of commission in their presence, cannot now be resorted to by the petitioner in support of a motion to suppress the evidence of that crime. Government agents have duties of crime

prevention and crime detection as well as the duty of arresting offenders caught in the commission of a crime or later identified as having committed a crime. The performance of the first duties are as important as the performance of the last. In this case the performance of the first halted the commission of the crime and also resulted in the arrest of the offender.

MR. JUSTICE JACKSON, dissenting.

When this Court recently has promulgated a philosophy that some rights derived from the Constitution are entitled to "a preferred position," *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115, dissent at p. 166; *Saia* v. *New York,* 334 U. S. 558, 562, I have not agreed. We cannot give some constitutional rights a preferred position without relegating others to a deferred position; we can establish no firsts without thereby establishing seconds. Indications are not wanting that Fourth Amendment freedoms are tacitly marked as secondary rights, to be relegated to a deferred position.

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These, I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality

deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.

Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. Federal courts have used this method of enforcement of the Amendment, in spite of its unfortunate consequences on law enforcement, although many state courts do not. This inconsistency does not disturb me, for local excesses or invasions of liberty are more amenable to political correction, the Amendment was directed only against the new and centralized government, and any really dangerous threat to the general liberties of the people can come only from this source. We must therefore look upon the exclusion of evidence in federal prosecutions, if obtained in violation of the Amendment, as a means of extending protection against the central government's agencies. So a search against Brinegar's car must be regarded as a search of the car of Everyman.

We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit. We must remember, too, that freedom from unreasonable search differs from some of the other rights of the Constitution in that there is no way in which the innocent citizen can invoke advance protection. For example, any effective interference with freedom of the press, or free speech, or religion, usually requires a course of suppressions against which the citizen can and often does go to the court and obtain an injunction. Other rights, such as that to an impartial jury or the aid of counsel, are within the supervisory power of the courts themselves. Such a right as just compensation for the taking of private property may be vindicated after the act in terms of money.

But an illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's supervision and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence.

And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies.

With this prologue I come to the case of Brinegar. His automobile was one of his "effects" and hence within the express protection of the Fourth Amendment. Undoubtedly the automobile presents peculiar problems for enforcement agencies, is frequently a facility for the perpetration of crime and an aid in the escape of criminals.

But if we are to make judicial exceptions to the Fourth Amendment for these reasons, it seems to me they should depend somewhat upon the gravity of the offense. If we assume, for example, that a child is kidnaped and the officers throw a roadblock about the neighborhood and search every outgoing car, it would be a drastic and undiscriminating use of the search. The officers might be unable to show probable cause for searching any particular car. However, I should candidly strive hard to sustain such an action, executed fairly and in good faith, because it might be reasonable to subject travelers to that indignity if it was the only way to save a threatened life and detect a vicious crime. But I should not strain to sustain such a roadblock and universal search to salvage a few bottles of bourbon and catch a bootlegger.

The Court sustains this search as an application of *Carroll* v. *United States,* 267 U. S. 132. I dissent because I regard it as an extension of the *Carroll* case, which already has been too much taken by enforcement officers as blanket authority to stop and search cars on suspicion. I shall confine this opinion to showing the several ways in which this decision seems to expand the already expansive right to stop and search automobiles.

In the first place, national prohibition legislation was found in the *Carroll* case to have put congressional authority back of the search without warrant of cars suspected of its violation. No such congressional authority exists in this case. The Court is voluntarily dispensing with warrant in this case as matter of judicial policy, while in the *Carroll* case the Court could have required a warrant only by holding an Act of Congress unconstitutional.[1]

---

[1] The *Carroll* case was based on the National Prohibition Act, 41 Stat. 305. Section 26 of that statute provided that when an officer discovered any person transporting liquor in violation of the law, in any vehicle, it was the officer's duty to seize the liquor, take possession of the vehicle, and arrest any person found in charge

A second and important distinction is that in the *Carroll* case the lower court had found that the evidence showed probable cause for that search, while in this case two courts below have held that (except for evidence turned up after the search, which we consider later) there was not probable cause. If we assume the facts to be indistinguishable, this important distinction emerges from the decisions: *Carroll* held only that these facts *permitted* a District Court, if so convinced, to find probable cause from them. The Court now holds these facts *require* a finding of probable cause. This shift from a permissive to a mandatory basis is a shift of no inconsiderable significance.

While the Court sustained the search without warrant in the *Carroll* case, it emphatically declined to dispense with the necessity for evidence of probable cause for making such a search. It said: "It would be intolerable and unreasonable if a prohibition agent were authorized to

thereof. The officer was required to proceed at once against any such person but, if no one was found claiming the vehicle, it was to be sold after appropriate notice and the proceeds paid into the Treasury. Section 25 of the Act authorized search warrants for private dwellings but only if they were being used in the illicit liquor business.

It had been proposed to amend the statute to forbid search of an automobile without warrant. After disagreement between the House and the Senate, that restriction was finally rejected. In the *Carroll* case, the legislative history of this proposed (Stanley) amendment was considered at length. 267 U. S. 144–146. The Court then concluded, 267 U. S. 147, that, without the amendment, the Act "left the way open for searching an automobile . . . without a warrant, if the search was not malicious or without probable cause." And it stated the issue thus: "The intent of Congress to make a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles and other road vehicles is [*sic*] the enforcement of the Prohibition Act is thus clearly established by the legislative history of the Stanley Amendment. Is such a distinction consistent with the Fourth Amendment? . . ."

stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." 267 U. S. 132 at 153.

Analysis of the *Carroll* facts shows that while several facts are common to the two cases, the settings from which those facts take color and meaning differ in essential respects.

In the *Carroll* case, the primary and the ultimate fact that the accused was engaged in liquor running was not surmise or hearsay, as it is here. Carroll and his companion, some time before their arrest, had come to meet the two arresting officers, not then known as officials, upon the understanding that they were customers wanting liquor. Carroll promised to sell and deliver them three cases at $130 a case. For some reason there was a failure to deliver, but when the officers arrested them they had this positive and personal knowledge that these men were trafficking in liquor. Also, it is to be noted that the officers, when bargaining for liquor, saw and learned the number of the car these bootleggers were using in the business and, at the time of the arrest, recognized it as the same car.

Then this Court took judicial notice that the place whence Carroll, when stopped, was coming, on the international boundary, "is one of the most active centers

for introducing illegally into this country spirituous liquors for distribution into the interior." 267 U. S. at 160. These facts provided the very foundation of the opinion of this Court on the subject of probable cause, which it summed up as follows:

"The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whiskey to the officers which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids where they plied their trade. That the officers when they saw the defendants believed that they were carrying liquor we can have no doubt, and we think it is equally clear that they had reasonable cause for thinking so." 267 U. S. at 160.

Not only did the Court rely almost exclusively on information gained in personal negotiations of the officers to buy liquor from defendants to show probable cause, but the dissenting members asserted it to be the only circumstance which could have subjected the accused to any reasonable suspicion. And that is the sort of direct evidence on personal knowledge that is lacking here.

In contrast, the proof that Brinegar was trafficking in illegal liquor rests on inferences from two circumstances, neither one of which would be allowed to be proved at a trial: One, it appears that the same officers previously had arrested Brinegar on the same charge. But there had been no conviction and it does not appear whether the circumstances of the former arrest indicated any strong probability of it. In any event, this evidence of a prior arrest of the accused would not even be admissible in a trial to prove his guilt on this occasion.

As a second basis for inference, the officers also say that Brinegar had the reputation of being a liquor runner. The weakness of this hearsay evidence is revealed by con-

trasting it with the personal negotiations which proved that Carroll was one. The officers' testimony of reputation would not be admissible in a trial of defendant unless he was unwise enough to open the subject himself by offering character testimony. See *Greer* v. *United States,* 245 U. S. 559, 560.

I do not say that no evidence which would be inadmissible to prove guilt at a trial may be considered in weighing probable cause, but I am surprised that the Court is ready to rule that inadmissible evidence alone, as to vital facts without which other facts give little indication of guilt, establish probable cause as matter of law. The only other fact is that officer Malsed stated that twice, on September 23 and on September 30, about six months before this arrest, he saw Brinegar in a Missouri town, where liquor is lawful, loading liquor into a truck, not the car in this case. That is all. The Court from that draws the inference which the courts below, familiar we presume with the local conditions, refused to draw, *viz.,* that to be seen loading liquor into a truck where it is lawful is proof that defendant is unlawfully trafficking in liquor some distance away. There is not, as in the *Carroll* case, evidence that he was offering liquor for sale to anybody at any time. In the *Carroll* case, the offer to sell liquor to the officers would itself have been a law violation. It seems rather foggy reasoning to say that the courts are obliged to draw the same conclusion from legal conduct as from illegal conduct.

I think we cannot say the lower courts were wrong as matter of law in holding that there was no probable cause up to the time the car was put off the road and stopped, and that we cannot say it was proper to consider the deficiency supplied by what followed. When these officers engaged in a chase at speeds dangerous to those who participated, and to other lawful wayfarers, and ditched the defendant's car, they were either taking the

initial steps in arrest, search and seizure, or they were committing a completely lawless and unjustifiable act. That they intended to set out on a search is unquestioned, and there seems no reason to doubt that in their own minds they thought there was cause and right to search. They have done exactly what they would have done, and done rightfully, if they had been executing a warrant. At all events, whatever it may have lacked technically of arrest, search and seizure, it was a form of coercion and duress under color of official authority—and a very formidable type of duress at that.

I do not, of course, contend that officials may never stop a car on the highway without the halting being considered an arrest or a search. Regulations of traffic, identifications where proper, traffic census, quarantine regulations, and many other causes give occasion to stop cars in circumstances which do not imply arrest or charge of crime. And to trail or pursue a suspected car to its destination, to observe it and keep it under surveillance, is not in itself an arrest nor a search. But when a car is forced off the road, summoned to stop by a siren, and brought to a halt under such circumstances as are here disclosed, we think the officers are then in the position of one who has entered a home: the search at its commencement must be valid and cannot be saved by what it turns up. *Johnson* v. *United States,* 333 U. S. 10; *McDonald* v. *United States,* 335 U. S. 451; and see *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690.

The findings of the two courts below make it clear that this search began and proceeded through critical and coercive phases without the justification of probable cause. What it yielded cannot save it. I would reverse the judgment.

MR. JUSTICE FRANKFURTER and MR. JUSTICE MURPHY join in this opinion.