**STATE of Iowa, Appellee,**

v.

**Gerald Aaron McREYNOLDS, Appellant.**

No. 54872.

Supreme Court of Iowa.

Feb. 25, 1972.

Rehearing Denied April 10, 1972.

Bailey C. Webber, Ottumwa, for appellant.

Richard C. Turner, Atty. Gen., James W. Hughes, Asst. Atty. Gen., and Samuel O. Erhardt, Wapello County Atty., for appellee.

UHLENHOPP, Justice.

The principal question in this appeal is whether a search by a police officer without a warrant was lawful.

Defendant McReynolds, of Palo Alto, California, is a 39-year-old individual of considerable advanced education and also work experience on technical and scientific jobs. In the summer of 1970, he visited relatives in Iowa. At that time, according

to his testimony, his uncle pointed out hemp plants growing wild. Defendant returned home but soon flew back to Iowa in his airplane, which he left at the Municipal Airport of Ottumwa, Iowa.

Defendant proceeded to harvest and dry a substantial quantity of hemp, placing it in an army duffle bag and in two garbage cans. He "stashed" these on the farm where he stayed. On September 14th he filled the airplane with gasoline and then watched the weather for a favorable departure time.

On the evening of about September 15, 1970 (the exact date is not clear), an informer telephoned Iowa Highway Patrolman Alfred E. Steffen that defendant's airplane might be used to transport marijuana. Patrolman Steffen contacted Sergeant Hugh G. McElroy, who was commander of the Ottumwa Police Drug Enforcement Division and was also a deputy sheriff. Sergeant McElroy had taken specialized training in field tests of drugs, drug identification, law enforcement, and chemical testing. He had conducted several hundred tests of suspected materials. Officers Steffen and McElroy went to the airport that evening. They did not open or enter defendant's airplane, but looked into it from the outside with the help of a light. They saw nothing suspicious.

Thereafter, Patrolman Steffen received three or four more contacts from the informant that defendant's plane might be used to transport marijuana. His superior, Lieutenant Frank Davis, arranged with the owner of Midwest Aviation at the airport, one Jerry M. Strunk, to notify the law officers if defendant attempted to use the plane.

About 1:30 p. m. on September 17, 1970, the informant telephoned Patrolman Steffen at home that defendant's plane might leave that afternoon with marijuana. Patrolman Steffen got to the Highway Patrol office about 2:25 p. m. He called Sergeant McElroy, asking him to come to the Patrol office. Sergeant McElroy arrived about 3:10 p. m. and received the information the informant had provided. He then returned to police headquarters.

Meantime, the weather being favorable on September 17th, defendant had his uncle drive him to the airport. Defendant had his suitcase and chart kit. He did not file a flight plan with the Federal Aeronautics Administration officials. After his uncle had left the airport, defendant rented a car, drove to the marijuana cache, brought back the marijuana, and loaded it in the airplane. He returned the rented car, untied the airplane, drained excessive fuel from the sumps, entered the plane, turned on the master switch, and checked the controls.

Jerry M. Strunk saw defendant load the duffle bag and garbage cans into the airplane. He called the Highway Patrol and Sergeant McElroy about 3:25 p. m., and related that information to them. Sergeant McElroy left for the airport, arriving in five or ten minutes. Police headquarters requested the Highway Patrol to assist, and Patrol officers soon left for the airport.

Sergeant McElroy arrived first and observed defendant at the controls of the airplane. He approached the plane from the left side. He testified he smelled an aroma of marijuana, although considerable dispute exists about that. He discovered the plane had no door on the left side and called through the ventilator requesting defendant to open the plane. He then went around to the right side and stepped on the wing but did not enter the plane. Defendant slid over to the right side and opened the door. Sergeant McElroy identified himself as an officer and showed his badge. He told defendant he had information that narcotic drugs were aboard the airplane. Defendant nodded affirmatively and mumbled "yes." The sergeant asked where the drugs were and defendant answered "in there or back there," indicating the rear of the plane. At some point during these occurrences Sergeant McElroy

read defendant the Miranda warning, and defendant asked whether the sergeant was a state or federal officer. The sergeant answered he was a city and county officer.

Sergeant McElroy asked defendant if he would remove the material. On trial defendant testified, "Distressed as I was, I took it out." The sergeant asked defendant if he needed assistance. Defendant responded he did not and unloaded the material alone.

Defendant placed the duffle bag and cans on the apron of the airport. Sergeant McElroy opened the duffle bag, observed the contents, and arrested defendant.

Subsequently, defendant was charged by county attorney's information with possession of marijuana. He demurred to the information on the ground, among others, that the statute under which the charge was laid was vague and indefinite. The demurrer was overruled.

Prior to trial, defendant moved to suppress evidence of the material in question as unlawfully seized without a warrant. The motion was overruled. At trial defendant renewed that objection, but it was again overruled. The jury found defendant guilty as charged and he was sentenced. He appealed.

In this court defendant asserts two main contentions: the statute under which defendant was charged is vague and indefinite and therefore invalid, and the marijuana was unlawfully seized without a warrant.

■ I. *Statute Invalid?* At the time of this occurrence Iowa had the Uniform Narcotic Drug Act, and defendant was charged with possession of a narcotic drug under the provisions constituting § 204.2, Code, 1971. "Narcotic drugs" are enumerated in § 204.1(10), and while that subsection is not a model of clarity, legislative intent to include marijuana is manifest. (In this connection see 64 G.A. ch. 148, §§ 601(1), 605(1).)

Then marijuana is defined thus, in § 204.1(10)(c):

"Marijuana" means all parts of the plant cannabis sativa L., whether growing or not, the seeds thereof, the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin, but shall not include the mature stalks of such plant, fiber produced from such stalks, oil, or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks, except the resin extracted therefrom, fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

Since possession of a narcotic drug is made an offense by § 204.2, since marijuana is named in the statute as a narcotic drug, and since marijuana is defined in detail in § 204.1(10) (c), supra, the ground of the demurrer that the statute is indefinite and vague was not well taken. Statutes less definite than this one have been upheld. State v. McNeal, 167 N.W.2d 674 (Iowa); People v. Oliver, 66 Cal.App.2d 431, 152 P.2d 329 (possession of the plant cannabis sativa); Miller v. State, 11 Terry 579, 137 A.2d 388 (Del.) (marijuana); State v. Bonoa, 172 La. 955, 136 So. 15.

As to rulings during the trial, express testimony was introduced that the material in defendant's possession was cannabis sativa L. That made such issue for the jury, and defendant's objections in that connection were properly overruled.

■ Defendant strenuously contends that the statute is really aimed at strong marijuana grown in hot climates. He says that Iowa-grown marijuana contains little tetrahydrocannabinol which causes the physiological effect users desire. But Iowa marijuana does contain some tetrahydrocannabinol—the difference is quantitative rather than qualitative. Defendant's contention is a policy argument to be ad-

drcssed to the legislature. Section 204.-1(10) (c) does not differentiate strong marijuana from weak marijuana. See United States v. Kellerman, 432 F.2d 371 (10th Cir.); People v. Piper, 19 Cal.App. 3d 248, 250, 96 Cal.Rptr. 643, 644 ("The law regulating possession of marijuana draws no distinction between a high grade and a low grade plant."); People v. Pohle, 20 Cal.App.3d 78, 97 Cal.Rptr. 364. The present definition is not vague, and the material defendant had in his possession comes within the definition.

II. *Unlawful Seizure?* The Attorney General claims that there was no search and no seizure by Sergeant McElroy—that the sergeant did not "search" for the narcotics, but rather, that defendant admitted he had narcotics aboard and indicated that they were in the rear; and that the sergeant did not "seize" the narcotics, but rather, that defendant unloaded them unassisted. The Attorney General claims in addition that whatever the officer did was with defendant's consent. We do not decide these claims for we rest the decision on probable cause.

■ We recently reviewed the subject of searches and seizures of mobile vehicles, in the case of State v. King, 191 N.W.2d 650 (Iowa). See also. State v. Hollingshead, 191 N.W.2d 680 (Iowa), and State v. Baych, 169 N.W.2d 578 (Iowa). We pointed out that while a warrant is generally necessary to search a mobile vehicle, officers may search without a warrant when exigent circumstances and probable cause exist. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. Did exigent circumstances and probable cause exist here? We think so.

■ As to exigent circumstances, the very mobility of a vehicle frequently creates exigence. E. g., Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 2d 419. Here, however, defendant contends Patrolman Steffen got his first tip at least by September 15 that defendant's plane might be used to transport narcotics, and that the officers had abundant time between then and the afternoon of September 17 to get a search warrant. Defendant also contends that even on the afternoon of September 17, the officers had time to get a warrant between 1:30 p. m., when the informant telephoned Patrolman Steffen that defendant might take off that afternoon, and about 3:30 or 3:45 p. m., when defendant was readying to take off.

But the officers were on the horns of a dilemma. To get a warrant they had to show facts and circumstances showing probable cause. Aguilar v. Texas, 378 U. S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637. See also Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306. All the officers had were unconfirmed tips from an informer. They checked out the first tip on the evening of September 15 by looking into the plane with a light, but discovered no concrete evidence. Had they been able to persuade a magistrate to issue a warrant, the charge of an invalid warrant would have been leveled at them as in Aguilar and Spinelli. Moreover, the officers were confronted with the risk of never solving the crime if they moved prematurely.

Viewing the problem confronting the officers from the standpoint of practical law enforcement rather than with the benefit of the hindsight which we now possess, we think the officers did not act in an unconstitutional manner. They set up surveillance by the owner of Midwest Aviation. When that individual saw defendant loading the plane, he notified the officers. The articles which defendant loaded—the duffle bag and the garbage cans—might have looked sufficiently suspicious, taken with the informer's tip, to justify the issuance of a search warrant. But that question we need not decide. When the officer got the message from Strunk, the situation was exigent indeed. They

went into action. Actually, the officers did not have hard evidence that defendant had narcotics until defendant nodded affirmatively when Sergeant McElroy said he understood defendant had narcotic drugs on board. The situation was quite similar to the one in Husty v. United States, 282 U.S. 694, 701, 51 S.Ct. 240, 242, 75 L.Ed. 629, 632–633. The Court there said:

> The search was not unreasonable, because, as petitioners argue, sufficient time elapsed between the receipt by the officer of the information and the search of the car to have enabled him to procure a search warrant. He could not know when Husty would come to the car or how soon it would be removed. In such circumstances, we do not think the officers should be required to speculate upon the chances of successfully carrying out the search, after the delay and withdrawal from the scene of one or more officers which would have been necessary to procure a warrant.

We think exigent circumstances existed here.

As to probable cause, when Sergeant McElroy arrived at the plane, he did not demand entry into the plane, nor did he search it. He stated to defendant he understood defendant had narcotic drugs aboard. Defendant nodded and mumbled "yes." At that point the sergeant not only had probable cause but very strong cause to believe the plane contained contraband, from defendant's own lips. The sergeant could lawfully proceed with a search and seizure. Here the case is quite similar to Scher v. United States, 305 U.S. 251, 253–255, 59 S.Ct. 174, 176, 83 L.Ed. 151, 154–155:

> As petitioner was getting out of his car this officer approached, announced his official character, and stated he was informed that the car· was hauling bootleg liquor. Petitioner replied, "just a little for a party." Asked whether the liquor was tax paid, he replied that it was Canadian whisky; also, he said it was in the trunk at the rear of the car. The officer opened the trunk and found eighty-eight bottles of distilled spirits in unstamped containers. He arrested petitioner and seized both car and the liquor. The officer had no search warrant. . . .

> Considering the doctrine of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (see Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L. Ed. 629), and the application of this to the facts there disclosed, it seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest. So much was not seriously controverted at the argument.

> Passage of the car into the open garage closely followed by the observing officer did not destroy this right. No search was made of the garage. Examination of the automobile accompanied an arrest, *without objection and upon ·admission of probable guilt*. The officers did nothing either unreasonable or oppressive. (Italics added.)

We think Sergeant McElroy had probable cause in the case at bar.

Defendant's motion to strike the State's brief and argument is overruled.

Affirmed.

All Justices concur except MASON and RAWLINGS, JJ., who dissent, and HARRIS, J., who takes no part.

MASON, Justice (dissenting)..

I dissent from division II.

The majority chooses to uphold the seizure of marijuana as a legitimate application of principles first announced in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, where the Supreme Court held valid a warrantless search of an

automobile when exigent circumstances and probable cause to suspect concealed contraband goods were shown to exist.

The majority has sought to find sufficient evidence of the two ingredients essential to the application of *Carroll*—exigent circumstances and probable cause. The court reasons the heart of exigency, as per *Carroll,* is mobility, the potential for flight, and thereby properly deduces an aircraft readying for take-off is like a moving vehicle and presents exigent circumstances. I believe the greater argument here, however, is the existence and timing of probable cause.

The court finds support for its discussion of probable cause in Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151, and quotes from it extensively. As in the case before us, defendant in *Scher* in response to direct and immediate inquiry admitted possession of contraband. Yet on a full reading of the *Scher* case, it is apparent there existed probable cause to search Scher's automobile *before* the colloquy between Scher and the law officer transpired. Besides a reliable tip, officers had observed the activities of defendant for a significant period of time before the encounter was made. It is in this respect the Supreme Court said: " * * * [I]t seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and placed him under arrest. * * *." 305 U.S. at 255, 59 S.Ct. at 176, 83 L.Ed. at 154. That is to say, there was probable cause to stop and search defendant Scher's automobile on the strength of the *Carroll* decision.

The distinction is a significant one. Carroll v. United States, 267 U.S. at 153–154, 45 S.Ct. at 285, 69 L.Ed. at 551–552, has this statement:

" * * * It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary, because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise. * * *."

As the majority has drawn the parallel between McReynolds' aircraft and a moving vehicle, Justice Taft's admonition would seem apropos to the circumstances here.

As the majority concedes, Sergeant McElroy did not have probable cause for search and seizure at the time he mounted the airplane and effectively precluded its free passage. Only after his conversation with defendant did McElroy's suspicions harden into probable cause, enabling him to proceed with search and seizure. This situation is factually very similar to Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

In *Brinegar,* an investigator of the Alcohol Tax Unit, and a special investigator were parked beside a highway in Oklahoma about five miles west of the Missouri-Oklahoma line. Defendant drove past the investigators in his car. One of the investigators had arrested defendant five months earlier for illegally transporting liquor; had seen defendant loading liquor into a car or truck in Joplin, Missouri, on at least two occasions during the preceding six months; and knew defendant to have a reputation for hauling liquor. As defendant passed, the investigator recognized both him and the automobile. Both agents later testified that the car appeared to be "heavily loaded" and "weighted down" with something. Defendant in-

creased his speed as he passed the officers; the officers gave chase. After pursuing him for about a mile at top speed, they gained on him as his car skidded in a curve. The officers sounded their siren, overtook defendant, and crowded his car to the side of the road.

The agent who recognized Brinegar got out of his car, walked back to him and said, "Hello, Brinegar, how much liquor have you got in the car?" or "How much liquor have you got in the car this time?" Defendant replied, "Not too much," or "Not so much." Several cases were found behind and under the front seat. Brinegar was placed under arrest and the liquor was seized.

The district court, on hearing defendant's motion to suppress the evidence, opined the fact the agents knew defendant was engaged in hauling whiskey, even coupled with the statement the car appeared to be weighted, did not constitute probable cause for a search of the car. It held, however, defendant's voluntary admission after the chase presented probable cause for a search, regardless of the legality of the detention and subsequent arrest.

The Supreme Court affirmed the conviction, *but* it made very clear its disapproval of trial court's theory of how and when probable cause to search and seize may arise. After a thoroughly exhaustive and painstaking recitation of facts attendant to the situation, leading up to *but not including Brinegar's admission*, the court expressed its views in this language, 338 U.S. at 170–171, 69 S.Ct. at 1308, 93 L.Ed. at 1887–1888:

"All these facts are undisputed. Wholly apart from * * * [the investigator's] knowledge that Brinegar bore the general reputation of being engaged in liquor running, they constitute positive and convincing evidence that Brinegar was engaged in that activity, no less convincing than the evidence in Carroll that the defendants had offered to sell liquor to the officers. * * *

"Notwithstanding the variations in detail, therefore, we think the proof in this case furnishes support quite as strong as that made in the Carroll case, indeed stronger in some respects, to sustain the ultimate facts there held in the aggregate to constitute probable cause for a search identical in all substantial and material respects with the one made here. * * *

"This is true, although the trial court and the Court of Appeals, including the dissenting judge, were of the opinion, as stated by the latter court, 'that the facts within the knowledge of the investigators and of which they had reasonable trustworthy information prior to the time the incriminating statements were made by Brinegar were not sufficient to lead a reasonably discreet and prudent man to believe that intoxicating liquor was being transported in the coupe, and did not constitute probable cause for a search.' * * * [citation] If, as we think, the Carroll case is indistinguishable from this one on the material facts, and that decision is to continue in force, it necessarily follows that the quoted 'finding' or 'conclusion' was erroneous."

The Court in *Brinegar* chose to ignore the effect of the "voluntary admission" of the defendant. Rather, it held the material facts were so similar in substance to the facts in Carroll, that by application of law probable cause for search of defendant's car existed as the chase began. Therefore, instead of permitting carte blanche detention of vehicles on the chance subsequent inquiry will produce probable cause for search, the court chose to overturn the low courts' conclusions and found sufficient probable cause at the outset.

The vigorous dissent of Mr. Justice Jackson advocated (a) acceptance of the trial court's conclusion the officers acted without probable cause before Brinegar's admission, and (b) reversal of conviction for reason of unconstitutional search and seizure by rejecting the notion probable

cause can be gained after the intrusion has already begun.

As in *Brinegar*, the facts in our case are undisputed. Unlike *Brinegar*, no probable cause exists preceding detention and defendant's voluntary admission; the majority concedes as much. Probable cause "has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790." Brinegar v. United States, 338 U.S. at 175–176, 69 S.Ct. at 1310–1311, 93 L.Ed. at 1890. See also State v. Baych, 169 N.W.2d 578, 582 (Iowa 1969); State v. King, 191 N.W.2d 650, 653, (Iowa 1971).

Nor does the majority cite any authority lending credence to the theory defendant's admission could be legitimately considered with the foregoing events to sustain evidence of probable cause. None of the cited cases were intended to afford officers the privilege of stopping mobile vehicles in order to collect evidence which hopefully would lead to sufficient probable cause to search. In each case there existed either an arrest or sufficient probable cause upon which to predicate initiation of action. See State v. King, supra; State v. Baych, supra; State v. Hollingshead, 191 N.W.2d 680 (Iowa 1971); Carroll v. United States, supra; Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; Chambers v. Maroney, 399 U.S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419; Scher v. United States, supra; Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629. See also Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538; Cooper v. State of California, 386 U. S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730; Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.

The Supreme Court has often repeated its preference for search with warrant. In the most recent case of Coolidge v. New Hampshire, 403 U.S. at 453, 91 S.Ct. at 2031–2032, 29 L.Ed.2d at 575, Mr. Justice Stewart in speaking for the Court said:

" * * * [W]e must not lose sight of the Fourth Amendment's fundamental guarantee. Mr. Justice Bradley's admonition in his opinion for the Court almost a century ago in Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, is worth repeating here:

'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to the gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.'

"Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made the course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and

the values it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own, they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important." (Emphasis in the original.)

I would hold the evidence was unreasonably seized in violation of the Fourth Amendment and reverse.

RAWLINGS, J., joins in this dissent.