**UNITED STATES of America,**
**Plaintiff,**

v.

**Luis L. CERVANTES, Defendant.**

**Crim. No. 25755.**

United States District Court
S. D. California, S. D.

June 16, 1959.

Laughlin E. Waters, U. S. Atty., by Peter J. Hughes, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

Oscar F. Irwin, San Diego, Cal., for defendant.

WEINBERGER, District Judge.

In February of 1956 defendant was tried and convicted of the offense of smuggling heroin and marihuana. After

the trial had begun, the defense made a motion to suppress the use as evidence of narcotics and a hypodermic syringe on the ground that the same was procured by illegal search and seizure.

A hearing was had on oral testimony outside the presence of the jury, at which Customs Agent Kenneth Grant testified, and the Court denied the motion.

On January 21, 1959, the Court of Appeals of the Ninth Circuit handed down its decision, and ordered:

"The judgment is reversed and the cause is remanded with directions to grant appellant a new trial, or, in the discretion of the trial court, to dismiss the action."

The defendant being an indigent, counsel was appointed, at his request, to defend him.

On March 30, 1959, counsel for the defendant moved to dismiss the indictment, which motion was denied and a new trial granted.

On April 16, 1959, defendant moved to suppress as evidence certain heroin, hypodermic syringe and marihuana seeds seized on December 8, 1955, on the ground that said property was unlawfully seized against the will of the defendant and without a search warrant.

A hearing was had at which the oral testimony of the officer making the seizure, Clifford J. Davis, and Customs Agent Kenneth Grant was heard. On motion of the defendant the testimony at the hearing was ordered transcribed at the expense of the government.

Upon the filing of the transcribed testimony and after arguments of counsel, the Court denied the motion and this memorandum is filed with reference to the denial of such second motion to suppress.

At said hearing the evidence disclosed that on December 8, 1955, Clifford J. Davis, a patrol inspector of the Immigration and Naturalization Service and also an authorized customs inspector, stopped the defendant in his automobile near San Clemente, California, on Highway 101. 101 is a main highway between the Mexican Border and Los Angeles, California. Mr. Davis testified that he stopped the automobile because he had received directions from the United States Customs officials of San Diego so to do. That he did not have a warrant for the arrest of the defendant nor for the search of the defendant or his automobile.

Mr. Davis stated that when the defendant stopped his automobile in response to a siren and red light of the officer, the defendant was asked to alight from the automobile. Upon alighting, Mr. Davis noticed that the defendant appeared to be under the influence of narcotics. He made no objection to the search of his person, which search revealed heroin, a syringe and an eye dropper. Search of the automobile disclosed a secret compartment containing a small amount of marihuana.

Mr. Kenneth Grant testified that he had been in the employ of the United States Custom Service since 1940 and most of the time had been stationed near the Mexican Border; that more arrests for narcotics are made at the port of entry at San Ysidro (near San Diego) at the Mexican Border than anywhere else in the United States; that Tijuana, Mexico, adjoining the said Port is considered to be the chief source of supply for marihuana and also supplies a large proportion of the heroin imported illegally, and that 75% of the narcotics so imported are destined for places further north than San Diego, California. Mr. Grant testified that he had alerted the officers who stopped Cervantes because he had received certain information from an informant which led him to believe that Cervantes was carrying narcotics or marihuana. That his informant was a man whom he had known for about five years prior to 1955. That several convictions in Federal court had resulted from information given Grant by this informer. That when the informer "suspected" that a person might be engaged in dealing with narcotics, he so stated, and not always had the suspicions been verified, but that Grant had never found the in-

formant wrong when he stated he "knew."

Mr. Grant further testified that he had been acquainted with a person named Manuel Vargas, whom Grant knew to have been dealing in narcotics since 1946. That during 1945, Vargas frequented a bar known as "La Officina" in Tijuana, and had his headquarters on First street near said bar. That the informant told Grant that when Vargas made a sale of narcotics or marihuana he would get drunk and would talk about the sale. The informant also told Grant that Vargas had boasted that he had a regular customer from Los Angeles named "Luis" who bought marihuana regularly in large quantities and who had a secret compartment built in his car especially for the purpose of carrying the marihuana. That the man known as Luis drove a green car, which might be a Dodge or a Plymouth and its license number was possibly 1W–4752 or 1W–47537. And that the informant had seen Luis in company of Vargas.

Mr. Grant stated the first information as to "Luis" came to him from the informant on September 27, 1955, by telephone. Mr. Grant posted a "lookout" at the border port of entry into the United States at San Ysidro by giving the officers of the Customs Service on duty at that point the two license numbers that he had been given by the informant. Grant then went to Tijuana about 2 p. m. on that day, and spent several hours looking around for either Vargas or the described car. About 5 or 6 o'clock, Grant located Vargas in the bar known as La Officina, but did not see the defendant. Grant then contacted his informant and told him that if the informant learned anything further that Grant would be available at a certain place. He also discussed with the informant the "secret" compartment, and the informant told Grant that "Luis" had a compartment in his car large enough to carry 20 kilos of marihuana.

Grant testified that he had many conversations with the informant on this subject between September 27 and De-

cember 8. After September 27, Grant told the informant that the officers at the port of entry had not stopped any car as was described, and the informant stated that "He is coming regularly and we will get him next time." "If he gets through once, he will be back again." Grant testified that the informant also told him that he was sure "Luis" was a user of heroin, but that he did not know where the heroin was obtained, and that Luis came to Tijuana about once a week from Los Angeles for marihuana.

That between September 27, and October 28, Grant saw his informant several times and gave him his home and office telephone so that the informant could reach him day or night, and told him to let Grant know as quickly as possible the next time the car was in Tijuana.

On October 28 the informant telephoned Grant and stated that the automobile and the driver were in Tijuana, and that if Grant could come down, the informant would point out the car. Grant proceeded to Tijuana. The informant told Grant that he, the informant, had misread the license number, and gave Grant the corrected number.

The informant also pointed out the automobile and Grant walked past the automobile and saw the defendant in it. That was the first time Grant saw the defendant. He checked the license number, and noted that it was the corrected number which the informant had given him. He testified that the informant said Cervantes had come to Tijuana looking for Vargas, but that Vargas was in Mexico City. Grant remained in Tijuana most of the afternoon and observed Cervantes at a distance but later lost him in traffic.

Grant testified that he had again placed a look-out for the automobile at the San Ysidro port of entry, but that a check with the officers there revealed that they had not seen the described car pass through such port.

After October 28, Mr. Grant submitted the corrected license number to the Department of Motor Vehicles and learned

that the automobile was a Chrysler registered to Luis L. Cervantes, Los Angeles. Grant then checked the criminal records of the San Diego County Sheriff's Office and they gave him a picture which he identified as that of the defendant, and also gave him the defendant's criminal record. That the defendant had been convicted in Federal Court in 1941 for illegal importation of marihuana, for possession of narcotics under the California statutes, and had other arrests for burglary and for possession of narcotics.

Mr. Grant stated that Mr. Parkerson's report which is Government's Exhibit 1 does not reflect all of the arrests and convictions of Cervantes. That he, Grant, thought there was a later conviction after 1941, but that he wasn't positive.

After October 28, Grant placed a "lookout" also at Calexico, another port of entry. That a third port of entry is at Tecate. That no lookout was, at that time, placed at Tecate, because it is a small port and the officers are familiar with all the cars that regularly go through and would be likely to search any car where they did not know the driver.

Mr. Grant further testified that he was in Tijuana on December 8, 1955, working on another matter. About 3 o'clock in the afternoon he saw Cervantes in the said automobile driving along First street. A young lady was seated in the car with him. Grant followed him and "maintained a short surveillance to try to find out where he was going," but lost him in traffic. He then returned to the port of entry to post a lookout, so he would feel secure that the car would be stopped. He then went back to Tijuana and looked for the car. When he did not find it, he returned to the Customs office at San Ysidro and learning they had not seen the car, he placed a look-out with the Immigration Border Patrol Officers at Oceanside. At about 6:45 P.M. Grant received a telephone call that the said vehicle had been detained at San Clemente and a substance believed to be narcotics and a hypodermic outfit had been found in Mr. Cervantes' possession.

Counsel for the defendant questioned Mr. Grant as to why he had not stated, at a previous hearing on a motion to suppress, that he had information that Cervantes was making frequent trips to Tijuana for narcotics. Mr. Grant replied that he probably forgot some of the things he had discussed with the informant. Also, that he could recollect that at the first hearing there were certain things he didn't testify to because he didn't think they were admissible. That he had many conversations with the informant between September 27th and December 8th, and that lots of times on the witness stand he forgets evidence he wants to get in. That if he is not asked the proper questions, he does not get the proper evidence in. That sometimes the attorneys forget to ask him certain questions until it is too late. Also he has noted that when he takes the stand he is expected to name dates and if he can't name dates, he doesn't include matters in his testimony. That he considers that when he received information that a person was making repeated trips to Tijuana, he should try to get dates before he puts such information in his official report.

Counsel for the defense proceeded with his questioning of the witness, stating:

"It appears in the records in the prior trial that he was several times asked if it was all the information he had, everything he knew, and never was there any mention he had been told the man was repeatedly going to Tijuana. And I think I am entitled under cross-examination to try to impeach him, to go into that, because they are pulling themselves strictly up by their own boot straps in supplying the missing vital link that the Appellate Court said had to be presented to make a case."

Mr. Grant was asked if the United States Attorney who was to handle the second motion to suppress told him it was going to be necessary to produce some additional evidence. Mr. Grant

stated that he was asked if any additional evidence existed, and Mr. Grant told the United States Attorney that in his opinion all of the evidence that could have been brought out in the first hearing was not brought out.

It is the view of the Court that Mr. Grant's credibility was in no way impeached by the comparison between his testimony at the first hearing and his testimony at the second hearing. He was not asked at the first hearing any questions which would elicit the direct statement in so many words that the informant told him Cervantes was making frequent trips. His testimony at the first hearing that he was told Cervantes "was dealing" (as distinguished from "had dealt") is consistent with his testimony at the second hearing that he had been told by the informant Cervantes was making frequent trips to Tijuana.

■ The evidence shows that Officer Grant, subsequent to 3 P.M. on December 8th, and until the time the defendant was stopped at San Clemente was continuously engaged in an attempt to pursue and apprehend the defendant. At no time during the period within which he might have obtained a search warrant on such day, was it practicable for him to abandon his efforts to pursue and apprehend the defendant in order to proceed to the office of the Commissioner and obtain the warrant. There was no necessity for a warrant to search the automobile at the port of entry; after Grant had reason to believe the defendant had eluded the officials at such port, it was too late to obtain a warrant, and he pursued the defendant by the only means at hand, through the telephonic alert to the officers at Oceanside.

In Brinegar v. United States, 338 U.S. 160, 165, 69 S.Ct. 1302, 1306, 93 L.Ed. 1879, the Court noted:

"Obviously the basic facts held to constitute probable cause in the Carroll case were very similar to the basic facts here. In each case the search was of an automobile moving on a public highway and was made without a warrant by federal officers charged with enforcing federal statutes outlawing the transportation of intoxicating liquors (except under conditions not complied with). In each instance the officers were patrolling the highway in the discharge of their duty. And in each before stopping the car or starting to pursue it they recognized both the driver and the car, from recent personal contact and observation, as having been lately engaged in illicit liquor dealings. Finally, each driver was proceeding in his identified car in a direction from a known source of liquor supply toward a probable illegal market, under circumstances indicating no other probable purpose than to carry on his illegal adventure."

At page 167 of 338 U.S., at page 1307 of 69 S.Ct. the Court further states:

"In the Carroll case [Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543] the Court judicially noticed that Detroit was located on the international boundary with Canada and had become an active center for illegally bringing liquor into the country for distribution into the interior. This was pertinent in connection with other circumstances, for showing the probability under which the agents acted that use of the highway connecting Detroit and Grand Rapids by the known operators in liquor was for the purpose of carrying on their unlawful traffic."

At page 175 of 338 U.S., at page 1310 of 69 S.Ct. the Court observed:

"* * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United

States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543.

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection."

The law enforcement officer in this case, Kenneth Grant, is a man with long experience in the means and methods of those who import narcotics and marihuana from Mexico into the United States; a man with long experience in the apprehension of law violators. He is a man whose very manner on the stand gives convincing proof of his credibility. The facts and circumstances within his knowledge, as shown by the evidence adduced at the hearing on the second motion to suppress, were such as to justify a man of reasonable caution in the belief that Cervantes was, on December 8, 1955, carrying a large quantity of marihuana in his automobile, and possibly heroin also. The circumstances were also such as to justify the officer's belief that unless he acted expeditiously, this dangerous contraband would be released upon an illegal market to the detriment of the community.

We quote a statement in the dissenting opinion of Mr. Justice Jackson in the Brinegar case, 338 U.S. at page 183, 69 S.Ct. at page 1314, which opinion was joined in by Mr. Justice Frankfurter and Mr. Justice Murphy:

"But if we are to make judicial exceptions to the Fourth Amendment for these reasons, it seems to me they should depend somewhat upon the gravity of the offense."

We believe that an officer, as a reasonable man, should, and that Mr. Grant did, weigh the gravity of the offense which he believed was being committed when he pursued the defendant without obtaining a search warrant. And, in our opinion, in so doing Mr. Grant did not exceed "fair leeway for enforcing the law in the community's protection."