THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* PEDRO LUCIANO ARROYO, k/a PELLÍN, Defendant and Appellant.

No. 16918. Decided September 27, 1961.

552

*Yamil Galib Frangie* and *Luisa María Capó* for appellant. *J. B. Fernández Badillo*, Attorney General of Puerto Rico, and *Héctor R. Orlandi Gómez*, Assistant Attorney General, for appellee.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

Pedro Luciano Arroyo was found guilty of a violation of Act No. 220 of May 15, 1948 (Sess. Laws, p. 738), known as "*Bolita* Act." He appeals and assigns several errors to the trial court, all of which bear on the search warrant. He alleges that the affidavit supporting the warrant contained false facts and that such falsity was known to the deponent. In that statement agent Julio Acevedo states that in the afternoon of September 24, 1959, as he passed by defendant's house, "I saw a stout middle-aged man standing on the porch of that house, that he had in his hands a great amount of *bolipool* tickets which he counted and checked, and upon noticing my presence he went rapidly inside the house and closed the door." At the hearing of the motion for suppression of evidence, the agent admitted that in other affidavits signed by him in the previous year, relating to "*bolita*" cases, he had made statements similar to those copied above.

His testimony on this matter, copied verbatim, is as follows:

"Q.—Witness, is this the first time that that has happened to you, that you go on walking and you see a person handling *bolipool* on the porch of a house and he goes inside, and you have not been able to do anything?

A.—I have seized *bolipool* on the street. On the street it is not the same as in a house.

Q.—Whether it is the first time that you see a person on a porch handling *bolipool?*

A.—It has happened several times.

Q.—Witness, have you ever requested a search warrant alleging the same thing, that you have seen a man or a woman handling *bolipool* and has gone inside, and you have requested a search warrant?

A.—I have requested it.

Q.—How many search warrants do you recall having requested in the past fiscal year?

A.—I guess three.

Q.—Will you tell me if they were the following: will you tell me if you recall having requested a search warrant to search the house of Conrado Rodríguez Ramos?

A.—Yes, sir.

Q.—Will you tell me whether in the sworn statement which you gave for the purpose of searching the house of Conrado Rodríguez Ramos you asserted that on July 14, 1959 you saw a dark woman, about 40 years old, of medium height, concrete apartment No. 46, housing project of the ward of Sábalos, who was handling *bolita* material and upon noticing your presence she went inside the house?

A.—Yes, sir.

Q.—Witness, will you also tell me whether in the case of Nicolás López Feliciano you also requested a search warrant, alleging that in the afternoon of May 31, 1959, while you were making the rounds, you saw a white stout man, about 45 years of age, handling *bolipool* on a porch, and upon noticing your presence he went inside the house on Mariano Abril Street No. 89?

A.—Yes, sir.

Q.—Witness, will you tell me whether in the case of Ignacio Cruz Valentín you made a statement on July 21, 1959, about two o'clock in the afternoon, alleging that you saw a negro woman, rather tall, handling *bolipool* in front of the house of Ignacio Cruz Valentín, and upon noticing your presence she closed the door? In the ward of Algarrobo, at the place Las Caiseas?

A.—Yes, sir.

Q.—Witness, will you tell me whether or not it is true that that is your way of procuring a search warrant whenever you receive confidences or information; whether you say the same thing in all the affidavits and in that way make the search?

A.—No, sir. That is not true.

Q.—Then I ask you: Do you know who is that dark woman, 40 years of age, who went inside the house of Conrado Rodríguez Ramos on July 14, 1959? Whether you already know who she is?

A.—No, sir.

Q.—Did you do anything to find out who that woman is, 40 years of age, of medium height? Whether you have done anything?

A.—No, sir.

Q.—Have you investigated?

A.—No, sir.

Q.—That day you did not wait for the dark woman to come out of the house?

A.—No, sir.

Q.—As far as you are concerned, do you suppose this woman has continued to handle *bolipool?*

A.—She may until she is caught.

Q.—And this white stout man, 45 years of age, who on May 31, 1959 went inside the house of Nicolás López Feliciano, did you find out who is that white stout man, about 45 years of age?

A.—No, sir.

Q.—Have you not done anything to find out who is that man?

A.—No, sir.

Q.—Any sort of investigation, any action to find out who is that white man?

A.—No.

Q.—That day, did you not remain on Mariano Abril Street waiting for that white man, about 45 years of age, to come out of the house of Nicolás López?

A.—No, sir.

Q.—What about the negro woman, rather tall, who on July 21, 1959 was in front of the house of Ignacio Cruz, do you know who that negro woman is?

A.—I know who she is.

Q.—Could you tell her name?

A.—I do not know the name.

Q.—You do not know her name, yet you know who she is? You do not know her name?

A.—I am not going to tell you the name.

Q.—You do not know the name?

DISTRICT ATTORNEY: The witness says he knows who she is.

JUDGE:

Q.—You know the name?

A.—I know the nickname, not the name.

ATTORNEY GALIB:

Q.—What is her nickname?

DISTRICT ATTORNEY: Do not answer. We have seen that the witness is reluctant, he does not wish to say the name of that person, and we, so that he will not be prejudiced, object to his saying the nickname or the name of that. person.

JUDGE: Overruled.

ATTORNEY GALIB:

Q.—What is her nickname?

A.—The nickname is Tuta.

Q.—Have you requested a search warrant against Tuta?

A.—No, sir.

Q.—Have you informed that to any peace officer, have you reported it on the police blotter at headquarters; have you notified the district attorney, or is this the first time you talk about Tuta?

A.—I talk about her because you are asking me.

Q.—You saw her on July 21, 1959 handling *bolipool*? I'm asking you if you have taken steps to accuse Tuta.

A.—No, sir.

Q.—You have not taken any action?

A.—No, sir.

Q.—Why?

A.—Because. I did not think it was necessary. I know her by that name. I did not think it was necessary. Besides, I found out later who she was and learned her nickname.

Q.—And you know where Tuta lives?

A.—Not where she lives.

Q.—But you have seen her after that?

A.—I have seen her.

Q.—And you have not thought of requesting a search warrant, or of making a sworn statement stating that you have seen Tuta handling *bolipool* tickets?

A.—No, sir. I did, however, request an order to search the house of Ignacio Cruz Valentín because that man has been found guilty of *bolipool*, but she was in Ignacio's house.

Q.—You took action against Ignacio but not against Tuta. Will you tell me whether it is true or not that you have not given, during the past fiscal year, any sworn statement requesting a search warrant, alleging something other than this: that

I saw someone handling *bolipool* tickets? Will you tell me whether or not it is true that all the sworn statements which you have given in the past year, all of them involve the same question: someone handling *bolipool* tickets on the porch of a house?

A.—Yes. Those are the only cases. There is nothing else.

Q.—Do you mean to tell me that it is a coincidence that the same thing has occurred in all of them?

A.—Well, more or less.

Q.—For example, one case: A white stout man, 45 years of age; another, a dark woman, 40 years; another, a negro woman, somewhat tall; and in this case, a stout man, of medium age.

A.—Only those.

Q.—Has there been no change in that pattern?

A.—There has been none.

Q.—Now, you have been working five years in the Vice Squad here in Mayagüez?

A.—Yes, sir.

Q.—And your specialty is against *bolita?*

A.—Yes, sir.

Q.—Yet, in the last four search warrants in which you have intervened, the persons who have handled *bolipool* have always been unknown, persons that you did not know, new people.

A.—There is one also.

Q.—And despite the fact that you have continued in that particular service against the *bolita,* and despite the fact that you know hundreds and hundreds of persons, you did not know these four persons involved in the statements, and you have not seen them again?

A.—I may have seen them, but I do not remember them."

At the hearing of the motion for suppression of evidence the policeman also stated that on the afore-mentioned date he had passed by defendant's residence, situated on the outskirts of Mayagüez, on his way to the government garage located near that residence where he was taking a police car to be lubricated. At a subsequent hearing on the same matter, the defense offered the testimony of the head of that

government agency, who, in view of the corresponding records which he had at hand, testified that there was no record that the automobile in question had been lubricated or repaired in the garage on the date stated by agent Acevedo. He explained that in the garage they keep a Daily Record of Cars Washed and Lubricated, and another Daily Record of Repairs, and that they did not contain any such record. There did appear an entry in connection with that automobile, but the date was later than that indicated by agent Acevedo. The witness admitted that no entries were made in the record in the case of minor repairs, of slight importance, and that the corresponding order was issued whenever the car was left there.

The district attorney then offered the testimony of police sergeant Pedro J. Ramírez, who testified briefly that automobile bearing license plate 101–109 was assigned to the Vice Squad of Mayagüez under his supervision; that on September 24, 1959, the automobile's motor was skipping and Julio Acevedo took it to the garage to be repaired; that the corresponding entry was made in the records of outgoing and incoming cars of the Police; that the automobile was in the garage the greater part of the afternoon; that he did not see it again until five o'clock; that Acevedo had returned on foot at half past two; and that he learned from Acevedo about the car being in the garage since no order had been issued to the garage.

The district attorney again offered the testimony of Julio Acevedo, who testified that he had taken the automobile to the garage for the purpose of correcting a "skip" in the motor and that he had explained the matter to mechanic Luis Castillo, whom he identified; that no order or paper of any kind was issued; that a spark cable of the car was loose; that the car remained in the garage from half past one to half past three; that at a first hearing he had testified that he had taken the car to be lubricated "because he could

not remember," but that later, in a conversation with sergeant Ramírez, the latter reminded him that he had taken it because the motor skipped; that that conversation took place after he went to the garage where he was informed by the chief that "someone had been there to get the record of the car, and that it did not appear that it was washed or lubricated"; that the sergeant had not been to court nor testified at the first hearing.

The district attorney then called mechanic Luis Castillo to testify, who asserted that he knew policeman Julio Acevedo and that he "always" drove automobile 101–109, but that he did not recall having repaired any defect of that automobile nor having "intervened" with it.

Lastly, sergeant Ramírez again testified and, after saying that he did not recall having talked with policeman Acevedo on the facts of the case, he asserted that he had "corrected" Acevedo "in connection with the fact that the car had not been sent for lubrication but for correcting a skip." On the basis of that evidence, the trial court dismissed the question raised by the defense.

Time and again we have held that the weighing of evidence made by the trial judge should be respected and upheld. We have only departed from this rule in cases of "manifest error" in the exercise of such function, whenever a detailed examination of the entire evidence convinces us that the trier unjustifiedly discarded important probative elements or founded his criterion on worthless, or inherently improbable or incredible testimony. *People* v. *Aponte*, 77 P.R.R. 870, 871 (1955); *People* v. *Amadeo*, 82 P.R.R. 98, 117 (1961). The reasons underlying these criteria are well known and we need not repeat them here.[1]

---

[1] The doctrines of presumption of innocence and reasonable doubt play an important role in criminal cases, but they do not have, however, any application to the incident of suppression of evidence.

On the other hand, for some time we have been concerned with the fact that the sworn statements on which many search warrants are issued and which we have examined, particularly those issued in *"bolita"* cases, contain certain stereotyped expressions whereby the deponent declares that he has observed certain persons handling *"bolita"* material in places exposed to casual inspection by any passer-by during heavy-traffic hours. We have respected the views of the trial judges who have accepted that type of statement because, even though it is doubtful that in the ordinary course of things the delinquents act in that fashion, we do not consider such act as "inherently improbable or incredible."

The case at bar is, however, much more serious. The first element of improbability cited is present: an officer who testifies having seen a person, in the afternoon, standing on the porch of a house situated on a public road, having in his hands, counting and checking a great amount of *bolipool* tickets, which person hurries inside the house upon noticing the officer's purely accidental presence. In the second place, it is established that that officer had given in the previous year affidavits which are practically identical in the only three cases in which he had taken such action, it appearing that in all of them, including the case at bar, the officer did not know [2] or investigate the person who allegedly handled *bolipool* tickets so publicly, and afterwards heard nothing more about them. Lastly, the testimony of such officer as to the reason which prompted him to pass in front of defendant's house on the date and hour stated in the affidavit was practically controverted by his own contradictions and by the impartial testimony of two public employees.

---

[2] It will be recalled that in one of the cases the officer testified that he knew one of the persons by her nickname, but did not investigate nor take action against her.

Considering all these circumstances, we do not have the least doubt that the sworn statement on which the search warrant was issued was fully discredited and was false in its essential part. We judges should not, after all, be so naive as to believe statements which no one else would believe.

 Which should be the consequences of such a determination? Let us begin by recalling that we have before us a law whose ancestry is so old and of such vital importance that it is indispensable in every system of civilized justice.[3] In our Constitution it was consecrated as follows:[4]

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated.

"Wire-tapping is prohibited.

"No warrant for arrest or search and seizure shall issue except by judicial authority and only upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the persons to be arrested or the things to be seized.

"Evidence obtained in violation of this section shall be inadmissible in the courts."

Sections 501-20 (34 L.P.R.A. §§ 1811-30) of the Code of Criminal Procedure provide an effective regulation which complements the constitutional text. The pivot of those

[3] " . . . Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police." Mr. Justice Jackson in *Brinegar* v. *United States*, 338 U.S. 160, 180 (1949).

[4] The Fourth Amendment to the Federal Constitution provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." L.P.R.A., Vol. 1, p. 151.

rules is the judges' discretion. It is exercised both at the commencement of the proceeding when the officer requests the warrant and at the end when, the warrant having been challenged by the defendant, the burden rests with the judge to decide whether or not the constitutional and legal requirements have been met. On the careful and fair examination of that discretion will depend, in a great measure, the continued efficacy and vitality of the constitutional right.

In a great majority of the states of the Union the accused is not permitted to challenge the truth of the averments in the sworn statement on which the search warrant is issued. *Search warrants: disputing matters stated in supporting affidavits,* 5 A.L.R.2d 394 (1949); 1 Varon, Searches, Seizures and Immunities 314–18 (1961). That was also the rule in Puerto Rico up until 1957. *People* v. *Villariny,* 71 P.R.R. 694 (1950). However, both in the federal jurisdiction—*Brinegar* v. *United States,* 338 U.S. 160, 163 (1949); *Steele* v. *United States,* 267 U.S. 498, 501 (1925); *King* v. *United States,* 282 F.2d 398 (4th Cir. 1960); *United States* v. *Napela,* 28 F.2d 898 (N.D., N.Y. 1928); Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.—and in our country, as of the said date —*People* v. *Torres,* 80 P.R.R. 238 (1958); Act No. 91 of June 22, 1957 (Sess. Laws, p. 435); 34 L.P.R.A. § 1828a— the contrary rule has prevailed. The federal case law on the matter, however, is quite scarce, and there has been no occasion in our medium to explain the applicable rules in such situations. The pertinent law guarantees to the defendant the right to impeach the sworn statement and it determines the time when a motion may be made, but it adds nothing else.[5]

---

[5] "(a) The aggrieved person may, through motion, challenge the sufficiency of any affidavit on which the issuance of a search warrant is based by means of proof that the statements made under oath in the affidavit are false, either in whole or in part.

"(b) The motion to said effect shall be filed at any time prior to

It is evident, therefore, that if the warrant is valid on its face, the burden is on the defendant to show the falsity of what he challenges. *United States* v. *Napela, supra* at 904; *United States* v. *Nagle*, 34 F.2d 952, 954 (N.D., N.Y. 1929); *Ludwig* v. *State*, 259 P.2d 321, 322 (Okl. 1953). As in every official act, a presumption of validity attaches to the sworn statement and to the search warrant which may be controverted only by a preponderance of the evidence and not on the basis of mere conjectures or rumors. *Dixon* v. *United States*, 211 F.2d 547, 548 (5th Cir. 1954). It is for the trial judge to evaluate the evidence in the inception and, with the exceptions already explained above, we will respect his criterion.

We need not, in view of the facts of the instant case, explain fully the scope of the judicial survey in these matters and of what under particular circumstances may be deemed to be a false assertion.[6] We will leave to the slowest but most reliable process of the decision of particular controversies to offer the necessary orientation. We may add that the law permits the challenge by means of proof that the assertion in the statement is false, "in whole or in part," and that in every case it shall be the duty of the trier to determine whether or not the falsity or the error is of such nature and extent as to require the annulment of the affidavit and, hence, of the warrant. As we have already explained, in the case at bar the falsity touches on the most vital part of the affidavit. Once that part is sup-

---

the date set for the trial, unless no opportunity to do so has arisen before that date, or unless the defendant had no knowledge of the grounds on which his motion is based prior to said date, and, in any case, it shall be in the discretion of the court to consider a motion of this nature during the trial."

[6] In addition to the cases cited in the text, examine *United States* v. *Henderson*, 17 F.R.D. 1 (D.C. 1954); *United States* v. *Bell*, 17 F.R.D. 13 (D.C. 1955); *Atlanta Enterprises, Inc.* v. *Crawford*, 22 F.2d 834 (N.D. Ga. 1927); *United States* v. *Boscarino*, 21 F.2d 575 (W.D., N.Y. 1927); *Lerner* v. *United States*, 151 A.2d 184, 187 (D.C. 1959).

564

pressed, the affidavit is insufficient, there is no probable cause, and the search warrant as well as the conviction and judgment founded on the illegal search should be annulled.

We know that the illegal game of *"bolita"* causes serious social and economic evils in Puerto Rico. In that game large sums of money are spent which belong almost entirely to the economically weaker groups; it has facilitated the creation and consolidation of professional criminal organizations which plunge from that activity into others which are more dangerous for society, and which constitute an erosive element even for the police force, *cf. People* v. *Adorno,* 81 P.R.R. 504 (1959); the constant presence of such illegal game in our medium is a perpetual menace to our juridical system and to the respect which every citizen owes the officers charged with the public peace.[7] We also know of the great difficulties in eradicating that offense, as well as other offenses which consist in the handling and possession of small objects, and that the State has for a long time made considerable efforts to curb it.

Those serious social realities can not, however, bring about the relaxation of the constitutional norms which limit the investigation and criminal-accusation proceedings. They are a minimum of guarantees that every truly civilized society offers to itself in an endeavor to conduct the proceedings in a reliable and equitable manner, and in the understanding that human justice is essentially fallible and that it is urgent, therefore, to afford procedural protections which may mitigate its fallibility. The relaxation and disregard

---

[7] The statistics compiled by the Office of Court Administration reveal that in the fiscal years 1959–1960 and 1958–1959, the clandestine lottery cases constituted 14.3 per cent and 18.87 per cent, respectively, of all the cases submitted to the Superior Court. The cases for violation of the Alcoholic Beverages Act, in a great majority of which search warrants are also issued, constituted 21.7 per cent and 18.9 per cent of all the cases for those years.

of those minimum guarantees is a very high price to be paid for greater police efficiency. *Cf. People* v. *Meléndez,* 80 P.R.R. 759, 775–76 (1958).

It is well to remind the trial judges, as principal custodians of the daily observance of the constitutional requirements, that "though the police are honest and their aims worthy, history shows they are not appropriate guardians of the privacy which the Fourth Amendment protects." *Jones* v. *United States,* 362 U.S. 257, 273 (1960).

The judgment appealed from will be reversed and the defendant acquitted.