JUAN FLORES VALENTÍN y MARGARITA VEGA MATOS, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. GERARDO CARREIRA MAS, JUEZ, demandado.

*Número:* C-64-36          *Resuelto:* 26 de febrero de 1965

*Noel Colón Martínez*, abogado de los peticionarios; *J. B. Fernández Badillo, Procurador General*, y *J. F. Rodríguez Rivera, Procurador General Auxiliar*, abogados del demandado.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Hernández Matos emitió la opinión del Tribunal.

Revisamos una resolución que desestimó una solicitud de supresión de evidencia.

El 11 de abril de 1963 los esposos Juan Flores Valentín y Margarita Vega Matos fueron acusados ante la Sala de San Juan del Tribunal Superior por dos infracciones al Art. 29 de la Ley de Narcóticos de Puerto Rico, aprobada el 18 de

junio de 1959. (¹) Se les imputó que en o para el día 13 de febrero de 1963 y en San Juan . . . obrando conjuntamente y de común acuerdo entre sí, tenían en su posesión y dominio la droga narcótica conocida como marihuana.

Seis días antes del señalado para juicio presentaron moción sobre supresión de evidencia. Expusieron que la droga narcótica a que se referían las acusaciones—cigarillos y picadura de marihuana—había sido ocupada por agentes del orden público en el curso de un allanamiento y registro ilegal del "negocio-residencia" de ellos, sito en el barrio Puerta de Tierra de San Juan, practicado a las 4:30 de la madrugada del 13 de febrero de 1963, consistiendo su ilegalidad en que tal allanamiento y registro se había efectuado bajo la autoridad de una orden que ya había sido definitivamente cumplida y ejecutada mediante la ocupación, horas antes, en el pueblo de Vega Baja, del revólver para cuya búsqueda y ocupación exclusivamente se había solicitado y librado la orden de allanamiento.

Se celebró una vista sobre esa moción. Ambas partes aportaron evidencia testifical y documental. El 22 de abril de 1964, previa la presentación de alegatos, fue resuelto en Corte abierta el incidente contra los acusados, en los siguientes términos:

"Expedida una orden de allanamiento que de su faz era válida basada en causa probable, el Tribunal entiende que no hubo un registro irrazonable de la casa de Juan Flores Valentín y Margarita de Flores y el Tribunal resuelve declarar como declara sin lugar la Moción de Supresión de Evidencia.

"La defensa pide la reconsideración y el Tribunal se ratifica en su resolución."

Los peticionarios señalan la comisión de dos errores. El primero se funda en la negativa del Tribunal de instancia

---

(¹) Este Art. 29 prohibe la tenencia, posesión, traspaso, uso, aplicación, prescripción, manufactura, preparación, cualquier transferencia o recibo y la introducción, ocultación y transportación en Puerto Rico de opio de fumar, heroína y marihuana.

a dar "peso evidenciario a una orden de allanamiento diligenciada y devuelta a la autoridad judicial que la expidiera, dándole peso a su vez a testimonio oral que varía el contenido de dicha orden o 'return' . . .". El segundo se basa en haberse declarado válido un allanamiento ilegal, inoficioso e irrazonable y que constituía una "extralimitación del poder conferido en una orden de allanamiento a unos agentes del orden público, quienes ya tenían en su poder el arma objeto de dicha orden".

Por su íntimo enlace discutiremos conjuntamente los dos errores señalados. Expondremos en primer término ciertos hechos que surgen de la prueba ofrecida, tanto documental como testifical.

En la mañana del 8 de febrero de 1963 un triunvirato de nuestro bajo mundo formado por un tal "Jessie James", un tal "Charlie" y otro individuo llamado José Enrique Díaz Guiñales, escalaron cierta residencia de la zona metropolitana. Hurtaron de la misma un revólver Smith & Wesson y la suma en efectivo de once dólares. Dio cuenta del escalamiento el dueño de la residencia a la policía y ésta comenzó su investigación.

Tres días después, es decir el 11 de febrero, Díaz Guiñales prestó ante un juez de paz la siguiente declaración jurada:

"Declaro, que el día 8 de febrero de 1963, como a las 7:00 de la mañana llegó a mi casa Angel Luis Torres Suárez, conocido por 'Jessie James' y otro a quien conozco por Charlie. Que me invitaron a ir con ellos a la calle 33 bloque AA-3, Embalse, San José, y me dijeron que ellos se iban a meter en una casa a robar. Que cuando llegamos a la casa del Sr. Luis Díaz Horta, Jessie mandó a Charlie con un destornillador a romper el candado de la marquesina. Que Charlie rompió el candado y penetró al patio y luego allí rompió la cerradura de la puerta de la cocina. Que entonces me invitaron a que yo entrara y yo entré con ellos. Que fuimos hasta un cuarto donde había una caja fuerte y mientras yo velaba ellos la rompieron con una barra y un destornillador sin encontrar dinero alguno en dicha caja. Que entonces el amigo Charlie se metió a un cuarto pegado a éste y buscó por la cama y

encontró un revólver y una bolsa plástica conteniendo $11.00 en pesetas. Que cogimos el revólver y los chavos y nos fuimos para Puerta de Tierra. Que entonces Jessie James me amenazó con matarme si yo decía algo a la Policía. Que el dinero él lo repartió y me dio $3.00 a mí, $3.00 a Charlie y Jessie cogió $5.00. Que el revólver lo cogió Jessie y luego me lo dio para que yo se lo fuera a vender a un tal Marco Polo en $40.00. Que hoy sé que Marco Polo se llama Juan Flores Valentín. Que le dí los $40.00 a Jessie James y él me dio $12.00 a mí y cogió $28.00 para él."

Juan Flores Valentín, casado con Margarita Vega Matos, —coacusada bajo el nombre de Margarita de Flores—para entonces ocupaba un edificio sito en la calle San Agustín de Puerta de Tierra, que dedicaba a vivienda, barbería y a un pequeño negocio denominado "Marco Polo".

Al siguiente día el detective Joaquín Peña, ante el mismo juez prestó otra declaración jurada en la que describió el mencionado edificio y expuso que había frecuentado el negocio de Juan Flores Valentín que éste administraba "en unión a una señora blanca", y que "ese negocio es frecuentado por individuos de mala calaña y especialmente uno conocido por Jessie James."

A base de esas declaraciones otro detective de nombre Luis Rodríguez Collazo solicitó del Juez de Paz de Guaynabo la expedición de una orden de allanamiento para proceder al registro del referido local—el negocio Marco Polo—"en busca del arma en cuestión para producirla como evidencia ante el Hon. Tribunal correspondiente" el día en que el caso del referido escalamiento sea señalado para verse en corte y "ocupar cualquier otra prueba o artículos poseídos en contravención a la ley." Se libró entonces la siguiente orden de allanamiento:

"EL PUEBLO DE PUERTO RICO, a cualquier agente de Orden Público en el distrito de la Ciudad Capital de San Juan, P.R.

Habiéndose en este día presentado prueba, por medio de la declaración jurada firmada por José Enrique Díaz Guiñales, Joaquín Peña Peña y Luis Rodríguez Collazo (copias de las cuales

se acompañan), creditativa de que en la casa sin número, radicada en la calle conocida por Antigua Vía de Puerta de Tierra, P.R., construida de hormigón y madera, techada de zinc, de dos aguas, pintada por fuera de gris claro, rosa y azul y por dentro de gris claro, negro y verde; por el frente colinda con la calle conocida por Antigua Vía y el Caserío del mismo nombre; por el lado derecho con un solar vacío donde hay una planta de hormigón, sin pintar; por detrás con una casa de apartamientos de dos plantas, propiedad de la Familia Méndez; con tres puertas y por el frente; dos ventanas por el lado izquierdo y una por el lado derecho y una por la parte de atrás; al lado derecho tiene una pequeña habitación de hormigón y madera cerrada con candado y unida a la casa; por detrás una habitación dedicada a trastienda con una puerta que la une a un negocio cafetín que hay instalado en la parte del frente de la casa; que la trastienda está unida a la estructura de la casa del propio negocio; que el negocio tiene un rótulo en la parte del frente superior que lee 'Marco Polo' y otro rótulo que lee 'Marco Polo Barber Shop' en letras rojas y azules; que este negocio y trastienda son propiedad y administrados por el Sr. Juan Flores Valentín, c/p Marco Polo y que en la administración participa una dama, blanca, de pelo negro, como de 21 años, como de 5 pies de estatura y 110 libras de peso. Que el día 10 de febrero de 1963, los individuos José Enrique Díaz Guiñales y Angel Luis Torres Suárez, c/p Jessie James, vendieron en dicho negocio a Juan Flores Valentín, c/p Marco Polo el revólver marca Smith & Wesson, calibre 38, serie 821267, en la suma de $40.00, producto de un escalamiento perpetrado al Sr. Luis Díaz Horta, en la calle 33 AA-3 Bda. San José, sitio Embalse de Hato Rey, P.R., en horas del día 8 de febrero de 1963.

Se le ordena por tanto, que durante las horas del día o de la noche proceda inmediatamente al registro del negocio y trastienda descritos anteriormente, en busca de las prendas siguientes: el revólver descrito en esta orden y cualquier otra prenda o artículo poseído en contravención de la ley.

Y si fueren en su totalidad o en parte halladas por Ud. las traiga inmediatamente a mi presencia en el Tribunal de Districto de Puerto Rico, Sala de Guaynabo, P.R."

Se libró también orden de arresto contra Juan Flores Valentín, por infracción al Art. 438 del Código Penal (compra, recibo y posesión, por lucro, de cosa mueble sabiendo que

fue hurtada). Para su cumplimiento la orden de allanamiento y la de arresto fueron entregadas entre las ocho y las nueve de la noche del 12 de febrero al teniente de la policía José A. Castro.

El teniente Castro salió en persecución de Flores Valentín hacia Vega Baja, sitio donde, según la información que tenía, podía encontrarlo. Entre una y una y media de la mañana del día 13 de febrero detuvo a Juan Flores Valentín que viajaba para Mayagüez en una camioneta de su propiedad, con varios obreros que iban a pintarle una casa que tenía en esa ciudad, transportando pinturas, brochas, rolos y demás equipo para pintar. La detención se practicó en la carretera insular Núm. 2, cerca del semáforo localizado en las inmediaciones del pueblo de Vega Baja. La policía hizo bajar de la camioneta a Flores Valentín y esos obreros, los llevaron al cuartel de la policía de Vega Baja y allí los registraron sin encontrarles armas encima. La camioneta fue dejada al cuidado de la policía en el sitio de la detención, pero como a la media hora de haber estado Flores Valentín bajo arresto en el cuartel de Vega Baja se presentó un policía conduciéndola, y al llegar al cuartel, otro policía que también venía en ella dijo "aquí encontramos un revólver". Entonces "preguntaron a todos de quién era. Ninguno dijo". Ese revólver, del cual se incautó el teniente Castro, fue identificado allí como el descrito en la orden de allanamiento librada especialmente para su búsqueda.

Respecto a quién ejecutó la orden de allanamiento la evidencia practicada ofrece dos versiones en conflicto. La de los peticionarios revela que el teniente Castro, con esa orden de allanamiento o registro en su poder y ya ocupado el revólver y arrestado Juan Flores Valentín, como a las cuatro de la madrugada, en un vehículo de patrulla, emprendió el viaje de regreso hacia San Juan; que "antes de llegar a Buchanan" avisó por radio al Cuartel General: "ya arrestamos a Valentín, vamos para allá a allanar su casa"; que siguió directa-

mente para Puerta de Tierra, llegando aquí como a las cuatro y media, encontrando cerrado el negocio "Marco Polo"; que hizo levantarse a la señora del acusado y abrir ese negocio; que poco después llegaron al sitio otros detectives; que procedieron al registro y ocuparon muchos artículos del negocio; que luego el teniente Castro diligenció bajo juramento la orden de allanamiento haciendo constar, entre otras cosas, que de acuerdo con esa orden él había procedido al registro y que el inventario de las prendas que unía a su juramento "contiene una verdadera y detallada relación de todas las prendas por mí encontradas en cumplimiento de dicha orden".

La del fiscal tendió a demostrar que luego de haber recibido el teniente Castro las órdenes de arresto y allanamiento él había entregado ésta al detective Enrique Gómez Rodríguez para que en unión a otros la ejecutara, reteniendo la de arresto para diligenciarla personalmente; que Gómez Rodríguez y sus acompañantes,—que utilizaban vehículos de patrulla equipados con radios—, sin tener noticias de que el revólver que se mandaba a buscar en esa orden de allanamiento había sido ya ocupado por el teniente Castro en Vega Baja, procedieron a ejecutarla allanando el negoció "Marco Polo", entre cuatro y cinco de esa madrugada y que el teniente llegó al sitio del registro después que se había terminado, y había jurado la constancia del diligenciamiento de la orden de allanamiento porque era el responsable, jefe y director de su ejecución.

Sin embargo, a la luz de ambas versiones, quedó indiscutiblemente establecido el hecho básico de que el revólver, única prenda a buscarse bajo la autoridad de la orden de allanamiento, estaba materialmente en poder del teniente Castro mucho antes del momento en que se inicia y efectúa el allanamiento o registro del negocio "Marco Polo", y que en esa noche Castro actuaba como tal "jefe y director" de las diligencias de arresto y allanamiento.

■ Con la ocupación en Vega Baja del revólver quedó plenamente ejecutada y cumplida la orden de allanamiento. Su virtualidad y eficacia jurídicas para proceder después al registro del negocio habían quedado agotadas desde esa ocupación. En tales circunstancias, el posterior allanamiento resultó irrazonable, ilegal, inválido e ineficaz. Aceptando la veracidad de la versión de El Pueblo, la falta de conocimiento de la previa ocupación del revólver—atribuible exclusivamente al teniente Castro cuyo vehículo disponía de eficiente equipo para comunicar inmediatamente, a través de la estación del Cuartel General, la ocupación del revólver a los detectives a quienes había acá encargado la ejecución de la orden de allanamiento, que también utilizaban vehículos de patrulla con aparatos de radio—no podía en forma alguna restituir a la orden de allanamiento ejecutada su primitiva autoridad, validez y eficacia, aunque pudiera ello tomarse como falta de malicia de parte de los agentes que practicaron el registro.

■ El aditamento en términos generales que figuraba en esa orden a los efectos de que además de dicho revólver se buscara "cualquier otra prenda o artículo poseído en contravención de la ley", aunque no produce la nulidad integral de la orden de allanamiento, carece de valor legal por contravenir lo dispuesto en la Sec. 10 del Art. II de nuestra Constitución y los Arts. 501, 503 y 506 del antiguo Código de Enjuiciamiento Criminal entonces en vigor, reproducidos por las actuales Reglas 229 y 231 de Procedimiento Criminal.

■ No procede librarse órdenes de allanamiento con tal superfluo aditamento que nada señala en particular; constituye una peligrosa coletilla que puede tomarse como pretexto o excusa para que se interpreten extensivamente los términos y alcance de la orden, violándose así imperativos preceptos constitucionales y estatutarios. Véase *Pueblo* v. *Yulfo*, 71 D.P.R. 820, 822 (1950).

■ No es imposible creer que en el presente caso, tal aditamento fuera tomado como presunta autoridad para también incautarse los agentes del orden público que practicaron el registro, de gran parte de la mercancía, artículos, objetos y cosas del negocio "Marco Polo", que en nada se parecían a un revólver, como camisas de dormir, chambras de mujer, camisas de hombres, tostadoras eléctricas, radios transitores, taladros, botellas de licor, televisores, luces de bengala, destornilladores, cartones de cigarrillos Chesterfield, Kent, Salem, Winston y Pall Mall, dagas morunas, tijeras de jardinero, etc., etc., y todo ello "para investigación por no haberse justificado su procedencia", según reza el inventario jurado preparado por el teniente Castro, quien, o practicó personalmente el registro según su propia declaración jurada del 13 de febrero de 1963, o solamente lo aceptó y dio por bien hecho según su propia y contraria declaración en la vista de la moción del 20 de noviembre de 1963.

Ese tipo de incautación general de bienes en casos como el presente, no se asimila a la ocupación incidental de objetos efectuada durante la práctica autorizada o conforme a derecho de un arresto o de un allanamiento. Al contrario, constituye lo que podríamos denominar un embargo policiaco de bienes muebles ajenos, respecto a los que no existe real o aparente enlace con la anterior o actual comisión de delito alguno y cuya posesión material no está prohibida por ley. (1a)

■ Por otro lado, de una mera lectura de las dos declaraciones juradas en que se apoyó la orden de allanamiento resulta que ellas no eran suficientes para que se dispusiera en esa orden que la misma se cumplimentara también a cualquier hora de la noche, y siendo ello así, el allanamiento o registro del negocio "Marco Polo" efectuado durante las ho-

---

(1a) Véase la interesante decisión unánime de la Corte Suprema nacional, recaída el 18 de enero de 1965, en el caso de *Stanford, Jr.* v. *State of Texas,* siendo ponente el Juez Stewart, publicada en 33 U.S.L. Week 4140–4143, 379 U.S. 476.

ras de la noche del 12 al 13 de febrero, también fue ilegal e inválido.

El Art. 511 del Código de Enjuiciamiento Criminal, vigente entonces, según su correcta versión en castellano, [2] disponía lo siguiente:

"El juez de paz insertará en la orden de allanamiento o registro, instrucciones para que ésta sea cumplimentada durante las horas del día, a menos que las declaraciones juradas estén positivamente seguras de que el individuo lleva consigo la prenda que se busca o ésta se encuentre en el lugar que ha de ser registrado, y en ese caso podrá insertar instrucciones para que la orden se cumplimente a cualquiera hora del día o de la noche."

Ni de la inserta declaración jurada del escalador Díaz Guiñales, ni de la del detective Peña, antes relacionada, se puede en forma alguna deducir que ellos tuvieran la completa seguridad, ni tan siquiera la más leve o remota seguridad, de que el revólver hurtado que se buscaba se encontraba "en el lugar que ha de ser registrado", es decir en el edificio ocupado por la familia y los negocios del acusado, ni tampoco que en los momentos en que se prestaban tales declaraciones tal revólver lo llevara encima Flores Valentín. [3]

Todo lo que respecto a éste declaró el primero fue que "Jessie James" le había dado el revólver "para que yo se lo fuera a vender a un tal Marco Polo en $40.00; que hoy sé que Marco Polo se llama Juan Flores Valentín. Que le dí los $40.00 a Jessie James y él me dio $12.00 a mí y cogió $28.00 para él." No especificó en qué lugar, ni en qué fecha, se realizó tal venta. Por esa razón, es incorrecto haberse expresado en la orden que los escaladores "Vendieron en dicho negocio a Juan Flores Valentín, c/p Marco Polo el revólver . . . ."

El detective Peña, como expusimos anteriormente, en su declaración se limitó a describir el edificio donde vivía y tenía su negocio el acusado y a expresar "Que en distintas oca-

---

[2] *Pueblo* v. *Negrón*, 72 D.P.R. 882, 884 (1951).

[3] Véanse *Pueblo* v. *De Jesús*, 73 D.P.R. 752, 756 (1952); *Pueblo* v. *Negrón*, supra; *Pueblo* v. *Yulfo*, supra.

siones, tanto de día como de noche, he visitado el referido Marco Polo en el sitio indicado anteriormente y siempre he visto administrándolo al Sr. Juan Flores Valentín en unión a una dama blanca, de pelo negro, como de 21 años, alrededor de 5 pies de estatura, como de 110 libras y especialmente en el día de hoy, en horas de la tarde, vi a Juan Flores Valentín conocido por Marco Polo, salir y dejar a esa dama atendiendo el negocio en su ausencia. Que ese negocio es frecuentado por individuos de mala calaña y especialmente uno conocido por Jessie James." Ni tan siquiera menciona el revólver o hace relación al mismo, ni al lugar donde esa prenda se encontraba o se hubiera encontrado en momento anterior alguno.

■ Hemos dejado para último lugar la exposición del más serio fundamento de nulidad de la orden de allanamiento. El mismo consiste en que de las dos declaraciones juradas en que se apoya, no surge en forma alguna causa probable para librarla, puesto que en ninguna de ellas se expuso o se desprende que el revólver sustraído por los tres escaladores el 9 de febrero de 1963 se encontrara oculto en sitio alguno, ni mucho menos en el negocio Marco Polo. (⁴)

---

(4) Como hemos ya expuesto, el revólver apareció, por primera vez, en las manos de un policía en el cuartel de Vega Baja, en la noche del 12 al 13 de febrero. En ese cuartel fue que dicho policía dijo "aquí encontramos un revólver", refiriéndose a la camioneta y luego de haberse dejado la misma al cuidado de la policía en el sitio de la detención del acusado. Si tal arma se halló al registrarse en la carretera la camioneta y mientras estaba detenido en Vega Baja el acusado Flores Valentín, ese registro fue ilegal a la luz de nuestra decisión en—*Pueblo* v. *Sosa Díaz*, 90 D.P.R. 622 (1964), siguiendo *Preston* v. *United States*, 376 U.S. 364 (1964).

De paso diremos que la orden de arresto contra él por una supuesta infracción al Art. 438 del Código Penal, también fue librada sin causa probable para tal arresto y, consecuentemente, inválida e ineficaz, porque en forma alguna surge o se desprende de las declaraciones juradas de Díaz Guiñales y del detective Peña que Flores Valentín comprara ". . . la cosa mueble—el revólver—sabiendo que fue hurtada . . .", circunstancia que constituye la característica fundamental o el ingrediente esencial para la comisión del delito definido por el mencionado artículo. *El Pueblo* v. *Acevedo*, 18 D.P.R. 236, 240 (1912); *El Pueblo* v. *Marietti*, 31 D.P.R. 690 (1923).

De conformidad con el Núm. I del Art. 502 del Código de Enjuiciamiento Criminal, aplicable al caso, tratándose de una prenda robada o estafada, debe surgir de la declaración o declaraciones juradas el sitio o lugar "donde estuviere oculta" esa prenda, o el nombre de la persona que se la haya robado o estafado o del de cualquiera otra persona en cuyo poder se hallare.

Es oportuno reproducir aquí los principios cardinales que sobre la cuestión resumimos en *El Pueblo* v. *Rivera*, 79 D.P.R. 742, 746 (1956) en los siguientes párrafos:

"La expedición de una orden autorizando registros o allanamientos está sujeta a las limitaciones que señala la Sección 10 de la Carta de Derechos de nuestra Constitución, a saber: sólo puede expedirse por autoridad judicial y 'ello únicamente cuando exista *causa probable,* apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse . . . y las cosas a ocuparse'. Cualquier evidencia obtenida en violación de la referida sección es, por mandato constitucional, inadmisible en corte. L.P.R.A., Tomo 1, pág. 189. Además, de acuerdo con los arts. 503 y 504 del Código de Enjuiciamiento Criminal, 'no se podrá librar orden de allanamiento sino en virtud de causa probable . . .' y el magistrado antes de librar la orden 'debe . . . examinar bajo juramento al querellante y a los testigos que éste presentare, tomando sus deposiciones por escrito, las cuales suscribirán'. 34 L.P.R.A. secs. 1813 y 1814. En adición, los arts. 505 y 506 de dicho Código prescriben que la declaración jurada debe exponer 'los hechos que tiendan a demostrar los fundamentos de la petición, o las causas legítimas (*probable cause*) que haya para creer que existen tales fundamentos' y que el juez debe librar la orden si quedare 'plenamente convencido de que hay fundamento para la petición o causas legítimas (*probable cause*) para creer en la existencia de aquellos fundamentos . . .' 34 L.P.R.A. secs. 1815 y 1816.

"El criterio o medida para juzgar si existe causa probable no puede expresarse en términos rígidos y absolutos: la cuestión estriba en determinar si los hechos y las inferencias que se derivan de los mismos, a juicio de una persona prudente y razonable, bastan para creer que se está cometiendo o se ha cometido el delito por el cual la ley autoriza la expedición de una orden

de allanamiento. *Carroll* v. *United States,* 267 U.S. 132 (1925) ; *Steele* v. *United States,* 267 U.S. 498 (1925) ; *Dumbra* v. *United States,* 268 U.S. 435 (1925). Meras sospechas no constituyen causa probable, pero tampoco es necesario que el juez quede convencido fuera de toda duda razonable de que se está violando la ley. Como indicó el Tribunal Supremo de los Estados Unidos en *Brinegar* v. *United States,* 338 U.S. 160, 175 (1949) : 'Cuando nos referimos a causa probable . . . actuamos a base de probabilidades. Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho. La norma o regla en cuanto a la prueba, por consiguiente, depende de la cuestión que debe probarse'. Resulta pues que la regla jurídica de causa probable reconoce y protege a la vez dos intereses: la exigencia relativa a la inviolabilidad de la persona y la necesidad de poner en vigor las leyes penales. Y al aplicarla en cada caso concreto es preciso conciliar ambos intereses. No hay otro modo de hacer compatible el orden social con la libertad individual."

*Por todo lo expuesto se anulará la resolución recurrida, dictada en corte abierta el 22 de abril de 1964 en las causas criminales G 63-417 y 418, seguidas contra Juan Flores Valentín y Margarita Vega, ante la Sala de San Juan del Tribunal Superior, por infracciones a la ley de narcóticos, y se ordenará la devolución material a los acusados de toda la propiedad incautada en ocasión de aquel allanamiento o registro, susceptible de uso legal, y la continuación de los procedimientos en forma compatible con esta opinión.*